BENAVIDES and PRADO, Circuit Judges:
Title II of the Americans with Disabilities Act (ADA),[1] like § 504 of the Rehabilitation Act,[2] provides that individuals with disabilities shall not “be denied the benefits of the services, programs, or activities of a public entity, or be subjected to dis *221 crimination by any such entity.” For nearly two decades, Title II’s implementing regulations have required cities to make newly built and altered sidewalks readily accessible to individuals with disabilities. The plaintiffs-appellants in this case, five individuals with disabilities, allege that defendant-appellee the City of Arlington (the City) has recently built and altered sidewalks that are not readily accessible to them. The plaintiffs brought this action for injunctive relief under Title II and § 504.
We must resolve two issues. First, we must determine whether Title II and § 504 (and their implied private right of action) extend to newly built and altered public sidewalks.[3] Second, we must determine whether that private right of action accrued at the time the City built or altered its inaccessible sidewalks, or alternatively at the time the plaintiffs first knew or should have known they were being denied the benefits of those sidewalks. We hold that the plaintiffs have a private right of action to enforce Title II and § 504 with respect to newly built and altered public sidewalks, and that the right accrued at the time the plaintiffs first knew or should have known they were being denied the benefits of those sidewalks.
I
The plaintiffs in this case depend on motorized wheelchairs for mobility. They allege that certain inaccessible sidewalks make it dangerous, difficult, or impossible for them to travel to a variety of public and private establishments throughout the City. Most of these sidewalks allegedly were built or altered by the City after Title II became effective on January 26, 1992[4] The plaintiffs sued the City on July 22, 2005, claiming that the inaccessible sidewalks violate Title II of the ADA and § 504 of the Rehabilitation Act. The complaint was most recently amended on August 9, 2007. The plaintiffs seek injunctive relief but not damages.
The district court dismissed the plaintiffs’ complaint on statute-of-limitations grounds. The district court determined that the plaintiffs’ claims accrued, and the relevant two-year limitations period began to run, on the date the City finished building or altering any inaccessible sidewalk. After requiring the plaintiffs to “replead their case and allege specific dates of the City’s alteration or construction efforts,” the district court dismissed the complaint because it did not allege dates of construction or alteration within two years of July 22, 2005.
On appeal, a panel of this Court began by considering whether the plaintiffs had a private right of action to enforce Title II with respect to inaccessible sidewalks. The panel unanimously held that the plaintiffs had such a right because public sidewalks are “services, programs, or activities” of a public entity within the plain meaning of Title II.[5] The panel next considered whether the plaintiffs’ claims were barred by Texas’s two-year personal-injury statute of limitations. The panel deter *222 mined that the statute of limitations is an affirmative defense on which the defendant has the burden of proof, and that the district court erred in requiring the plaintiffs to plead dates of construction in their complaint. The panel would have remanded for further proceedings. One member of the panel dissented, however, with respect to the panel majority’s finding that the plaintiffs’ claims “accrued on the date the City completed the construction or alteration of any noncompliant” sidewalk.[6] According to the dissenting judge, the plaintiffs’ claims did not accrue until the plaintiffs “physically encountered], or actually learn[ed] of and [were] deterred from attempting to access, a noncompliant sidewalk.”[7]
Both parties petitioned for rehearing en banc. The panel majority withdrew its initial opinion and issued a revised opinion.[8] In the revised opinion, the panel majority determined that sidewalks were not “services, programs, or activities of a public entity” within the meaning of Title II. The panel majority thus held that the plaintiffs did not have a private right of action to enforce Title II with respect to sidewalks “in instances where these facilities do not prevent access to some [other] service, program, or activity.”[9] The panel majority would have remanded the case “only to the extent [the plaintiffs] have alleged a noncompliant sidewalk, curb, or parking lot denies them access to a program, service, or activity that does fall within the meaning of Title II.”[10] With respect to the statute of limitations, however, the panel unanimously found that the plaintiffs’ claims did not accrue until the plaintiffs “knew or should have known” they were denied the benefits of the City’s services, programs, or activities.[11] A member of the panel again dissented, asserting that the construction, alteration, and maintenance of public sidewalks unambiguously are services, programs, or activities of a public entity within the plain meaning of Title II.[12]
We granted the plaintiffs’ second petition for rehearing en banc. At oral argument, the plaintiffs unequivocally abandoned any claims with respect to sidewalks built on or before (and not altered after) January 26, 1992. Accordingly, we deem the plaintiffs’ claims with respect to such sidewalks waived and abandoned.[13] All that remain to be considered are the plaintiffs’ claims with respect to sidewalks built or altered after January 26, 1992. We refer to such sidewalks as newly built or altered sidewalks.
II
We review de novo a district court’s dismissal of a complaint under Rule 12(b)(6).[14] “To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to ‘state a claim to relief that is plausible on its face.’ ”[15] A claim for relief is plausible on *223 its face “when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.”[16]
Ill
It is established that Title II of the ADA and § 504 of the Rehabilitation Act are enforceable through an implied private right of action. The issue is whether these statutes (and their established private right of action) extend to newly built and altered public sidewalks.[17] Based on statutory text and structure, we hold that Title II and § 504 unambiguously extend to newly built and altered public sidewalks. We further hold that the plaintiffs have a private right of action to enforce Title II and § 504 to the extent they would require the City to make reasonable modifications to such sidewalks.
A
1
The ADA is a “broad mandate” of “comprehensive character” and “sweeping purpose” intended “to eliminate diserimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.”[18] Title II of the ADA focuses on disability discrimination in the provision of public services. Specifically, Title II, 42 U.S.C. § 12132, provides that “no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.”
Section 504 of the Rehabilitation Act prohibits disability discrimination by recipients of federal funding. Like Title II, § 504 provides that no qualified individual with a disability “shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.”[19] The ADA and the Rehabilitation Act generally are interpreted in pari materia.[20] Indeed, Congress has instructed courts that “nothing in [the ADA] shall be construed- to apply a lesser standard than the standards applied under *224 title V [i.e., § 504] of the Rehabilitation Act ... or the regulations issued by Federal agencies pursuant to such title.”[21] The parties have not pointed to any reason why Title II and § 504 should be interpreted differently in this case. Although we focus primarily on Title II, our analysis is informed by the Rehabilitation Act, and our holding applies to both statutes.
As mentioned, there is no question that Title II and § 504 are enforceable through an implied private right of action.[22] Moreover, to the extent Title II’s implementing regulations “simply apply” Title II’s substantive ban on disability discrimination and do not prohibit conduct that Title II permits, they too are enforceable through Title IPs private right of action.[23] This is because when Congress intends a statute to be enforced through a private right of action, it also “intends the authoritative interpretation of the statute to be so enforced as well.”[24]
In interpreting the scope of Title II (and its implied private right of action), our starting point is the statute’s plain meaning.[25] In ascertaining the plain meaning of Title II, we “must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.”[26]
If we determine that the plain meaning of Title II is ambiguous, we do not simply impose our own construction on the statute. When confronted with a stat *225 utory ambiguity, we refer to the responsible agency’s reasonable interpretation of that statute. Here, because Congress directed the Department of Justice (DOJ) to elucidate Title II with implementing regulations,[27] DOJ’s views at least would “warrant respect”[28] and might be entitled to even more deference.[29]
2
We begin by determining whether the plain meaning of Title II extends to newly built and altered sidewalks. As noted, Title II provides that disabled individuals shall not be denied the “benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.”[30] The Supreme Court addressed this same statutory provision in Pennsylvania Department of Corrections v. Yeskey, and held that it “unambiguously” permitted a prisoner to sue a state prison.[31] The Supreme Court considered the text of Title II as it is “ordinarily understood,” and reasoned that “prisons provide inmates with recreational ‘activities,’ medical ‘services,’ and educational and vocations ‘programs,’ all of which at least theoretically ‘benefit’ the prisoners.”[32] The Supreme Court noted that “in the context of an unambiguous statutory text,” it is “irrelevant” whether Congress specifically envisioned that the ADA would benefit state prisoners.[33] That a statute may be “applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.”[34]
The ADA does not define the “services, programs, or activities of a public entity.” The Rehabilitation Act, however, defines a “program or activity” as “all of the operations of ... a local government.”[35] As already stated, we interpret Title II and the Rehabilitation Act in pari materia. Accordingly, like the Supreme Court in Yeskey, we must determine whether newly built and altered city sidewalks are benefits of “all of the operations” and “services” of a public entity within the ordinary meaning of those terms.
*226 Before resolving this issue, however, we briefly acknowledge two different ways of framing it. Some parties urge us to consider whether building and altering sidewalks are services, programs, or activities of a public entity, and thus whether the resulting sidewalks are “benefits” of those services, programs, or activities. Other parties urge us to consider whether a city sidewalk itself is a service, program, or activity of a public entity. As discussed below, we believe this case does not turn on how we frame the issue.[36] Either way, when a city decides to build or alter a sidewalk and makes that sidewalk inaccessible to individuals with disabilities without adequate justification, the city unnecessarily denies disabled individuals the benefits of its services in violation of Title II.
a
Building and altering city sidewalks unambiguously are “services” of a public entity under any reasonable understanding of that term. The Supreme Court has broadly understood a “service” to mean “the performance of work commanded or paid for by another,” or “an act done for the benefit or at the command of another.”[37] Webster’s Dictionary additionally defines a “service” as “the provision, organization, or apparatus for ... meeting a general demand.”[38] For its part, Black’s Law Dictionary defines a “public service” as work “provided or facilitated by the government for the general public’s convenience and benefit.”[39]
Under each of these common understandings, building and altering public sidewalks unambiguously are services of a public entity. The construction or alteration of a city sidewalk is work commanded by another (i.e., voters and public officials), paid for by another (i.e., taxpayers), and done for the benefit of another (e.g., pedestrians and drivers). When a city builds or alters a sidewalk, it promotes the general public’s convenience by overcoming a collective action problem and allowing citizens to focus on other ventures. Moreover, when a city builds or alters a sidewalk, it helps meet a general demand for the safe movement of people and goods.[40] In short, in common understanding, a city provides a service to its citizens when it builds or alters a public sidewalk.
A “service” also might be defined as “[t]he duties, work, or business performed or discharged by a public official.”[41] Under this definition too, newly built and altered public sidewalks are services of a *227 public entity. Cities, through their officials, study, debate, plan, and ultimately authorize sidewalk construction.[42] If a city official authorizes a public sidewalk to be built in a way that is not readily accessible to disabled individuals without adequate justification, the official denies disabled individuals the benefits of that sidewalk no less than if the official poured the concrete himself.
Furthermore, building and altering public sidewalks easily are among “all of the operations” (and thus also the “programs or activities”) of a public entity. Webster’s Dictionary broadly defines “operations” as “the whole process of planning for and operating a business or other organized unit,” and defines “operation” as “a doing or performing especially] of action.”[43] In common understanding, the operations of a public entity would include the “whole process” of “planning” and “doing” that goes into building and altering public sidewalks.[44]
In sum, in common understanding, building and altering public sidewalks are services, programs, or activities of a public entity. When a city decides to build or alter a sidewalk and makes that sidewalk inaccessible to individuals with disabilities without adequate justification, disabled individuals are denied the benefits of that city’s services, programs, or activities. Newly built and altered sidewalks thus fit squarely within the plain, unambiguous text of Title II.
b
Even if we focus on a public sidewalk itself, we still find that a sidewalk unambiguously is a service, program, or activity of a public entity. A city sidewalk itself facilitates the public’s “convenience and benefit” by affording a means of safe transportation.[45] A city sidewalk itself is the “apparatus” that meets the public’s general demand for safe transportation.[46] As the Supreme Court has observed, sidewalks are “general government services”[47] “provided in common to all citizens”[48] to protect pedestrians from the “very real hazards of traffic.”[49] The Supreme Court also has recognized that public sidewalks are “traditional public fora” that “time out of mind” have facilitated the general de *228 mand for public assembly and discourse.[50] When a newly built or altered city sidewalk is unnecessarily made inaccessible to individuals with disabilities, those individuals are denied the benefits of safe transportation and a venerable public forum.
3
Were there any doubt that the plain meaning of § 12132 extends to newly built and altered sidewalks, other provisions in Title II confirm that it does. Congress directed DOJ to “promulgate regulations” that “implement” § 12132.[51] Congress also required those implementing regulations to be consistent with Rehabilitation Act coordination regulations codified at 28 C.F.R. pt. 41.[52] Notably, the Rehabilitation Act regulations that Congress sought to replicate under Title II require new and altered facilities, including sidewalks, to be accessible in most circumstances.[53] That Congress directed DOJ to “implement” § 12132 by promulgating regulations governing newly built and altered sidewalks strongly suggests that Congress thought § 12132 would extend to such sidewalks.
In fact, the ADA actually prohibits courts from construing Title II to apply a lesser standard than the Rehabilitation Act and its implementing regulations.[54] As the Supreme Court has recognized, Congress’s “directive requires us to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act.”[55] Because the Rehabilitation Act regulations require new and altered facilities, including sidewalks, to be accessible in most circumstances, our construction of § 12132 requires no less.
Additionally, in clarifying the requirements of Title II in the unique context of “designated public transportation services” (e.g., regular rail and bus services), Congress expressly provided that § 12132 requires new and altered “facilities” to be accessible.[56] Although Congress did not define “facilities,” the relevant Department *229 of Transportation (DOT) regulations define the term to include, inter alia, “roads, walks, passageways, [and] parking lots.”[57] Congress’s express statement that § 12132 extends to newly built and altered facilities is a good indication that Congress thought § 12132 would extend to newly built and altered sidewalks.
The City draws our attention to a purported distinction between “transportation barriers” and “services” in Title II’s definition of a “qualified individual with a disability.” A qualified individual with a disability is defined as:
an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.[58]
According to the City, because Congress included transportation barriers and services in the same sentence, Congress must have contemplated that newly built and altered sidewalks (and other facilities) are not services, programs, or activities within the meaning of § 12132.
As an initial matter, if our focus is on building and altering sidewalks, as opposed to sidewalks themselves, the City’s distinction breaks down immediately. Even if the definition of a qualified individual with a disability suggests that sidewalks and services are mutually exclusive, the definition certainly does not suggest (contrary to any ordinary understanding) that building and altering sidewalks are not services.
In any event, Title IPs definition of a qualified individual with a disability does not suggest that sidewalks and services are mutually exclusive. The phrase “with or without ... the removal of architectural, communication, or transportation barriers” simply clarifies that the necessity of a reasonable accommodation does not disqualify, a disabled individual from invoking Title II in the first place.[59] Drawing from the complaint in this case, a transportation barrier might be a ditch. The definition thus tells us that a newly built or altered sidewalk implicates Title II even if making that sidéwalk readily accessible would require reasonably removing the ditch. In other words, a disabled individual’s right not to be denied access to a newly built or altered sidewalk does not turn on his ability to access that sidewalk in the first place. This in no way suggests that newly built and altered sidewalks are exempt from § 12132’s plain, unambiguous meaning.
Taking a step back, the phrase “with or without ... the removal of architectural, communication, or transportation barriers” in the definition of a qualified individual with a disability is used to expand Title IPs nondiscrimination mandate, not narrow it. The definition ensures that existing barriers are not used to justify future discrimination. But recognizing that existing transportation barriers sometimes impede access to public services does not suggest that Congress thought cities could go on building new, inaccessible sidewalks. We do not think Congress intended to limit the plain meaning of § 12132 by referring to a recognized form of disability *230 discrimination[60] in an effort to expand § 12132’s coverage.
4
Though unnecessary to resolve this case, legislative purpose and history confirm that Congress intended Title II to extend to newly built and altered sidewalks. Congress anticipated that Title II would require local governments “to provide curb cuts on public streets” because the “employment, transportation, and public accommodation sections of [the ADA] would be meaningless if people who use wheelchairs were not afforded the opportunity to travel on and between streets.”[61] Implicit in this declaration is a premise that sidewalks are subject to Title II in the first place. Congress’s specific application of Title II is consistent with its statutory findings. In enacting Title II, Congress found that individuals with disabilities suffer from “various forms of discrimination,” including “isolatfion] and segregation],”[62] and that inaccessible transportation is a “critical area[ ]” of discrimination.[63] Moreover, Congress understood that accessible transportation is the “linchpin” that “promotes the self-reliance and self-sufficiency of people with disabilities.”[64] Continuing to build inaccessible sidewalks without adequate justification would unnecessarily entrench the types of discrimination Title II was designed to prohibit.
Title II does not only benefit individuals with disabilities. Congress recognized that isolating disabled individuals from the social and economic mainstream imposes tremendous costs on society. Congress specifically found that disability discrimination “costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.”[65] Congress also anticipated that “the mainstreaming of persons with disabilities will result in more persons with disabilities working, in increasing earnings, in less dependence on the Social Security system for financial support, in increased spending on consumer goods, and increased tax rev *231 enues.”[66] The Rehabilitation Act was passed with similar findings and purpose.[67] Continuing to build inaccessible sidewalks without adequate justification would unnecessarily aggravate the social costs Congress sought to abate.
To conclude, it would have come as no surprise to the Congress that enacted the ADA that Title II and its implementing regulations were being used to regulate newly built and altered city sidewalks. Indeed, Title II unambiguously requires this result. Having considered both the statutory language of § 12132 as well as the language and design of Title II as a whole, we hold that Title II unambiguously extends to newly built and altered sidewalks. Because we interpret Title II and § 504 of the Rehabilitation Act in pari materia, we hold that § 504 extends to such sidewalks as well.
B
1
As discussed above, when a city decides to build or alter a sidewalk but makes that sidewalk inaccessible to individuals with disabilities without adequate justification, the city discriminates within the meaning of Title II. Such a sidewalk benefits persons without physical disabilities, yet that benefit is unnecessarily denied to similarly situated persons with physical disabilities. Continuing to build inaccessible sidewalks without adequate justification needlessly perpetuates the “isolation and segregation” of disabled individuals, and is the type of discrimination the ADA prohibits.[68]
That Title II extends to newly built and altered sidewalks does not mean that it, or its private right of action, requires cities to employ “any and all means” to make such sidewalks accessible.[69] A city’s obligation to make newly built and altered sidewalks readily accessible is not “boundless.”[70] As the Supreme Court stated in Tennessee v. Lane, Title II imposes an “obligation to accommodate,” or a “reasonable modification requirement.”[71]
On their face, DOJ’s regulations governing new and altered facilities are congruous with Title II’s reasonable modification requirement. Under DOJ’s regulations, each new sidewalk must be made “readily accessible” to individuals with disabilities.[72] This is because, as Congress recognized, the marginal costs of making a new sidewalk readily accessible *232 “are often nonexistent or negligible.”[73] With respect to altered sidewalks, the “altered portion” must be made “readily accessible” “to the maximum extent feasible” if it “could affect the usability of the facility.”[74] Again, this is because once a public entity decides to alter a sidewalk, it generally is not a significant burden to make the altered portion of that sidewalk accessible.[75] In any event, a public entity is not “required to undertake measures that would impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the service.”[76] Thus, DOJ’s regulations do not require cities to achieve accessibility at any cost. Instead, the regulations require only that when a city chooses to construct a new sidewalk or alter an existing one, the city must take reasonable measures to ensure that those sidewalks are readily accessible to individuals with disabilities. This is the same thing Title II requires.
Our conclusion is strongly suggested by the Supreme Court’s decision in Lane. In Lane, the Supreme Court found that Title II requires public entities “to take reasonable measures to remove architectural and other barriers to accessibility.”[77] In elucidating the scope of this “reasonable modification requirement,” Lane reviewed DOJ’s regulations with approval:
As Title II’s implementing regulations make clear, the reasonable modification requirement can be satisfied in a number of ways. In the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards. 28 C.F.R. § 35.151 (2003). But in the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures ... .[78]
The Supreme Court’s use of DOJ’s regulations to illustrate the scope of Title II’s reasonable modification requirement is a good indication that those regulations simply apply Title IPs nondiscrimination mandate.
Similarly, in Alexander v. Choate, the Supreme Court recognized that “[t]he regulations implementing § 504 [of the Rehabilitation Act] are consistent with the view that reasonable adjustments in the nature of the benefit offered must at times be made to assure meaningful access.”[79] As an example, the Supreme Court cited a Department of Health and Human Services regulation “requiring that new buildings be readily accessible” and “building alterations be accessible ‘to the maximum extent feasible.’ ”[80] Again, the Supreme Court’s reliance on these regulations to illustrate the scope of § 504’s reasonable adjustment requirement strongly suggests that those regulations (and the regulations *233 at issue in this case) simply apply § 504’s nondiscrimination mandate.
Consistent with the Supreme Court’s discussion in Lane and Choate (and our own analysis), at least three other circuits have upheld a private right of action to enforce DOJ’s regulations governing newly built and altered sidewalks. In Ability Center of Greater Toledo v. City of Sandusky, the Sixth Circuit upheld a private right of action to enforce DOJ’s regulations with respect to newly built and altered sidewalks.[81] Similarly, in Barden v. City of Sacramento, the Ninth Circuit permitted a private plaintiff to enforce DOJ’s regulations with respect to newly built and altered (and existing) sidewalks.[82] And in Kinney v. Yerusalim, the Third Circuit permitted a private plaintiff to enforce DOJ’s regulations with respect to altered sidewalks.[83] Although the Tenth Circuit’s decision in Chaffin v. Kansas State Fair Board did not concern sidewalks, it too upheld a private right of action to enforce DOJ’s regulations with respect to other facilities.[84]
On occasion, a plaintiff may attempt to enforce DOJ’s regulations beyond what those regulations and even Title II require. In such cases, DOJ’s regulations would not “simply apply” Title II’s mandate, and thus would not be privately enforceable.[85] Such cases generally should be dealt with at summary judgment or trial. If the City can show that making its newly built and altered sidewalks accessible would have been unreasonable when those sidewalks were built or altered, the City would be entitled to an affirmative defense.[86] Of course, the district court also will have discretion to craft an appropriate injunction based on the particular facts of the case,[87] and thus will be able to ensure that the City’s alleged violations are remedied in a reasonable manner. On the face of the plaintiffs’ complaint, however, we cannot say that the plaintiffs’ remaining claims are unreasonable as a matter of law.
2
So far, we have determined that the plain meaning of Title II extends to newly built and altered sidewalks, and that DOJ’s regulations governing such sidewalks will “simply apply” Title II in most cases. Unless there is some other reason to judicially limit Title II’s private right of action, that private right of action would seem to authorize the plaintiffs’ claims in this case.
The panel majority in Frame II would have limited Title II’s private right of action to sidewalks that serve as “gate *234 ways” to other public services, programs, or activities.[88] As already discussed, we find no statutory basis for such a limitation.[89] The panel majority relied primarily on a DOJ regulation, 28 C.F.R. § 35.149, which provides:
Except as otherwise provided in § 35.150 [governing the accessibility of existing facilities], no qualified individual with a disability shall, because a public entity’s facilities are inaccessible ... be denied the benefits of the services, programs, or activities of a public entity
According to the panel majority, § 35.149 suggests that sidewalks and services are mutually exclusive, and that sidewalks are subject to Title II only when they impede access to other services. The panel majority reasoned that if DOJ thought sidewalks could be a service, it would have simply regulated them like any other service and not included them in the definition of a facility.[90]
The problem with Frame II is that it interprets § 35.149 in isolation and ignores the rest of DOJ’s regulations. Section 35.149 is but one part of DOJ’s regulatory scheme. Read as a whole, DOJ’s regulatory scheme makes clear that sidewalks are defined as facilities not to exclude them from the scope of Title II, but simply to ensure that they are made accessible in a gradual and prioritized manner.
Had DOJ omitted sidewalks from the definition of a facility, §§ 35.130 and 35.149 would have required all sidewalks to be immediately accessible.[91] By including sidewalks in the definition of a facility, however, DOJ was able to craft a more nuanced approach. As already discussed, § 35.151 provides that each newly built or altered sidewalk must be readily accessible in most cases.[92] But §§ 35.149 and 35.150 qualify that existing sidewalks (i.e., sidewalks built on or before and not altered after January 26, 1992) need not be made accessible in most cases.[93] And to the extent an existing sidewalk impedes access to some other service, program, or activity, a city may adopt a variety of reasonable accommodations other than structural changes.[94] DOJ’s regulatory scheme thus treats newly built and altered sidewalks differently from existing sidewalks. This sensible approach does not suggest that DOJ intended to exclude newly built and altered sidewalks from the plain meaning of Title II’s nondiscrimination mandate or its private right of action.[95]
Were there any ambiguity in DOJ’s regulations (and we believe there is not), DOJ *235 has filed an amicus brief confirming that newly built and altered sidewalks “are a subset of services, programs, or activities,” and that such sidewalks need not “serve as a gateway to a service, program, or activity in order to be covered by Title II.” According to DOJ, §§ 35.149-51 “simply explain how the Act applies when the service, program, or activity is a facility, or takes place in a facility.” We observe that DOJ’s position is consistent with its amicus briefs in similar cases.[96] Because DOJ’s amicus brief corroborates our own analysis, we need not determine precisely how much deference it deserves.[97]
As a final matter, hmiting Title II’s private right of action to sidewalks that serve as gateways to other public services, programs, or activities would create an unworkable and arbitrary standard. Even on the panel majority’s view in Frame II, “there should be no set proximity limitation of the sidewalk to the benefit.”[98] But without a proximity limitation, the standard provides no guidance to courts or local governments about when a newly built or altered sidewalk must be accessible. The standard thus would undermine the ADA’s purpose of providing “clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities,”[99] and we reject it.
C
The City contends that the plaintiffs lack standing with respect to inaccessible sidewalks they have not personally encountered. To be sure, Article III standing requires a plaintiff seeking injunctive relief to allege “actual or imminent” and not merely “conjectural or hypothetical” injury.[100] Mere “some day” intentions to use a particular sidewalk, “without any description of concrete plans,” does not support standing.[101] But “imminence” is an “elastic concept” that is broad enough to accommodate challenges to at least some sidewalks that a disabled person has not personally encountered.[102] For example, a plaintiff may seek injunctive relief with respect to a soon-to-be-built sidewalk, as long as the plaintiff shows a sufficiently high degree of likelihood that he will be denied the benefits of that sidewalk once it is built.[103] Similarly, *236 a disabled individual need not engage in futile gestures before seeking an injunction; the individual must show only that an inaccessible sidewalk actually affects his activities in some concrete way.[104] On remand, the district court will be able to apply established standing doctrine to weed out any hypothetical claims. At this point, however, the plaintiffs have alleged in detail how specific inaccessible sidewalks negatively affect their day-to-day lives by forcing them to take longer and more dangerous routes to their destinations. This is sufficient to support their right to sue.
D
The City has waged a half-hearted attack on Title II’s constitutionality. According to the City, “[a]n interpretation that the ADA requires construction, maintenance and retrofilling [sic] of all City sidewalks, curb ramps and parking lots is unconstitutional because it would exceed Congress’ enforcement power under § 5 of the Fourteenth Amendment to the United States Constitution.” The City has supported its constitutional challenge with approximately three pages of briefing.
We decline to address the City’s constitutional challenge at this point. As a preliminary matter, we have not held that Title II requires the City to “construct ], maintain] and retrofi[t]” all of its existing sidewalks. We have held only that when a city decides to build or alter a sidewalk and makes that sidewalk inaccessible to individuals with disabilities without adequate justification, the city discriminates in violation of Title II. Because our holding is considerably narrower than the only interpretation the City asserts would be unconstitutional, it would appear that the City has no constitutional objection to our interpretation.
Additionally, DOJ has not yet had an opportunity to exercise its statutory right to intervene and defend the constitutionality of Title II.[105] DOJ’s absence, together with the parties’ sparse briefing, supports our decision not to address the constitutional arguments in this case. On remand, the City will have an another opportunity to present its constitutional arguments, and DOJ should have an opportunity to intervene.
IV
There remains the issue of whether the plaintiffs’ claims are barred by the statute of limitations. Neither Title II nor the Rehabilitation Act provides a limitations period. Furthermore, the default four-year limitations period for federal causes *237 of action does not apply to this case because that period applies only to claims “arising under an Act of Congress enacted after” December 1, 1990.[106] Both Title II and the Rehabilitation Act were “enacted” before December 1990,[107] and the plaintiffs have not shown that their claims were “made possible” by a post-1990 amendment to either statute.[108]
When Congress does not establish a limitations period for a federal cause of action, the “general rule” is that we borrow the most analogous period from state law.[109] We decline to adopt a state limitations period only when another federal statute “clearly provides a closer analogy,” and “when the federal policies at stake and the practicalities of litigation make that rule a significantly more appropriate vehicle for interstitial law making.”[110] Reference to federal law remains a “closely circumscribed” and “narrow” exception.[111]
No party disputes that Texas’s two-year personal-injury limitations period applies to this case.[112] We have already held that Texas’s personal-injury limitations period applies to Rehabilitation Act claims in another context,[113] and several of our sister circuits have applied similar limitations periods to claims under both Title II and the Rehabilitation Act.[114] This is because most discrimination claims involve “injury to the individual rights of a person,” and thus are analogous to personal-injury tort claims.[115] In light of this authority and the parties’ failure to show or even argue that we should apply some other limitations period, we apply Texas’s two-year personal-injury limitations period to this case.[116]
*238 Although we borrow a limitations period from state law, the particular accrual date of a federal cause of action is a matter of federal law.[117] Absent unusual circumstances not present in this case,[118] the rule is that accrual occurs when a plaintiff has “a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief.”[119] In other words, accrual occurs “the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured.”[120]
Drawing from the text of § 12132, an injury occurs (and a complete and present cause of action arises) under Title II when a disabled individual has sufficient information to know that he has been denied the benefits of a service, program, or activity of a public entity. As applied to this case, the plaintiffs’ cause of action accrued when they knew or should have known they were being denied the benefits of the City’s newly built or altered sidewalks. This accrual date dovetails with the plaintiffs’ standing to sue. As discussed above, a disabled individual has no standing to challenge an inaccessible sidewalk until he can show “actual,” “concrete plans” to use that sidewalk.[121] Only then is the individual actually, as opposed to hypothetically, denied the benefits of the sidewalk. But just as a plaintiff may not sue until he is actually deterred from using a newly built or altered sidewalk, so his complete and present cause of action does not accrue until that time.
Although the City recognizes that “vague and conclusory allegations related to disabled persons in general” are insufficient to support standing, the City nonetheless asserts that the plaintiffs’ claims accrued as a matter of law at the time the City built or altered its inaccessible sidewalks. The key point the City fails to grasp is that a city’s wrongful act and a disabled individual’s injury need not coincide. A city acts wrongfully when it builds an inaccessible sidewalk without adequate justification, but a disabled individual is not injured until he is actually deterred from using that sidewalk.
An example will help illustrate the point. Plaintiff Scott Updike did not become disabled until September 8, 2003 (less than two years before his complaint *239 was filed). Updike was not denied access to the City’s inaccessible sidewalks until he became disabled. Indeed, under our precedent, Updike could not have sued to enforce Title II until he became disabled.[122] Thus, regardless of when the City built or altered its inaccessible sidewalks, Updike did not have a complete and present cause of action under Title II, and his cause of action did not accrue, until at least September 8, 2003.
Updike’s claims highlight a more general problem with the City’s theory of accrual. Sidewalks are durable. If a disabled individual born two years and a day after an inaccessible sidewalk is built has no right to sue, new generations will be denied the benefits of that sidewalk simply because the city evaded litigation in the past. On the City’s theory, the City could knowingly construct an inaccessible sidewalk yet escape liability as long as no plaintiff sued for two years (and even if no plaintiff had standing to sue during those two years). We do not think Title II contemplates this result. As Congress noted when it enacted Title II: “historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.”[123] The City’s theory of accrual would entrench and reward the types of discrimination Title II was intended to eliminate.
The City asserts that if accrual occurs only when a plaintiff is actually deterred from using a newly built or altered sidewalk, the City might be liable for “unlimited potential municipal liability.” The City exaggerates. Our decision is limited to injunctive relief concerning newly built and altered sidewalks.[124] The City may avoid liability whenever it chooses simply by building sidewalks right the first time, or by fixing its original unlawful construction. In other words, the City is not liable forever; it is responsible only for correcting its own mistakes. This is not too much to ask, even when the City’s mistakes have gone unchallenged for two years.
As for the plaintiffs other than Updike, the City will have an opportunity to prove that these plaintiffs knew or should have known they were being denied the benefits of the City’s newly built or altered sidewalks more than two years before they filed their claims. This is because the statute of limitations is an affirmative defense that “places the burden of proof on the party pleading it.”[125] Under federal pleading requirements, which we follow,[126] a plaintiff is not required to al *240 lege that his claims were filed within the applicable statute of limitations.[127]
To be sure, a complaint may be subject to dismissal if its allegations affirmatively demonstrate that the plaintiffs claims are barred by the statute of limitations and fail to raise some basis for tolling.[128] A review of the plaintiffs’ complaint in this case, however, shows that there are issues of material fact as to when the plaintiffs knew or should have known they were being denied the benefits of the City’s newly built or altered sidewalks. The plaintiffs allege that they were denied the benefits of the City’s sidewalks “[w]ithin the last two years, if not also longer.” Although this allegation leaves open the possibility that some of the plaintiffs’ claims may be barred by limitations, it does not plead the plaintiffs out of their case. Construing the complaint in the plaintiffs’ favor, as we must on a motion to dismiss, the plaintiffs allege that they encountered the inaccessible sidewalks within two years of their complaint. Because the statute of limitations is an affirmative defense and not a pleading requirement, it is an issue that must be resolved through discovery and summary judgment or trial.
V
For the reasons stated, we hold that the plaintiffs have a private right of action to enforce Title II of the ADA and § 504 of the Rehabilitation Act with respect to newly built and altered sidewalks. We further hold that the plaintiffs’ private right of action accrued at the time the plaintiffs first knew or should have known they were being denied the benefits of the City’s newly built and altered sidewalks. Accordingly, we VACATE the district court’s judgment and REMAND for further proceedings.

. 42 U.S.C. § 12132.

. 29 U.S.C. § 794(a).

. Unless otherwise indicated, references to “sidewalks” refer to public sidewalks and parking lots.

. Title II was enacted on July 26, 1990 and became effective eighteen months later on January 26, 1992. Pub.L. No. 101-336 § 205(a), 104 Stat. 327, 338 (1990), (codified as amended at 42 U.S.C. §§ 12131-12165).

. See Frame v. City of Arlington, 575 F.3d 432, 435-37 (5th Cir.2009) ("Frame I"), withdrawn, 616 F.3d 476 (5th Cir.2010) ("Frame II"), vacated and reh'g en banc granted, 632 F.3d 177 (5th Cir.2011).

. Frame I, 575 F.3d at 441.

. Id. at 445.

. Frame II, 616 F.3d at 486.

. Id. at 488.

. Id. at 490.

. Id.

. Id.

. See Jackson v. Watkins, 619 F.3d 463, 466 n. 1 (5th Cir.2010).

. Harold H. Huggins Realty, Inc. v. FNC, Inc., 634 F.3d 787, 795-96 (5th Cir.2011).

. Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

. Id.

. We note that the City and its amici have repeatedly conceded (in their appellate briefing and at oral argument) that the plaintiffs have a private right of action to enforce Title II with respect to newly built and altered sidewalks. The City argues that it has limited obligations with respect to sidewalks built on or before (and not altered after) January 26, 1992, but, as noted above, the plaintiffs have abandoned their claims with respect to such sidewalks. Although our de novo review is not controlled by the City’s interpretation of Title II, see, e.g., Sanford.’s Estate v. Comm'r of Internal Revenue, 308 U.S. 39, 51, 60 S.Ct. 51, 84 L.Ed. 20 (1939); Equitable Life Assurance Soc'y of U.S. v. MacGill, 551 F.2d 978, 983 (5th Cir. 1977), the City’s concession supports our decision.

. PGA Tour, Inc. v. Martin, 532 U.S. 661, 675, 121 S.Ct. 1879, 149 L:Ed.2d 904 (2001) (citation and quotation marks omitted); see also 42 U.S.C. § 12101(b)(1), (2) (stating that the ADA is intended to provide a “clear and comprehensive national mandate” for eliminating disability discrimination as well as "clear, strong, consistent, enforceable standards” addressing such discrimination); Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 599, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) ("The ADA stepped up earlier measures to secure opportunities for people with developmental disabilities to enjoy the befits of community living.”).

. 29 U.S.C. § 794(a).

. See, e.g., Kemp v. Holder, 610 F.3d 231, 234-35 (5th Cir.2010); Pace v. Bogalusa City Sch. Bd„ 403 F.3d 272, 287-88, 289 n. 76 (5th Cir.2005) (en banc).

. 42 U.S.C. § 12201(a); Bragdon v. Abbott, 524 U.S. 624, 632, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) ("The directive requires us to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act.”); cf. 42 U.S.C. § 12133 (providing that "[t]he remedies, procedures, and rights” available under the Rehabilitation Act "shall be the remedies procedures, and rights” available under Title II of the ADA).

. See United States v. Georgia, 546 U.S. 151, 154, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006) ("Title II authorizes suits by private citizens for money damages against public entities that violate [Title II].”); Tennessee v. Lane, 541 U.S. 509, 532, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (holding that private plaintiffs could enforce Title II with respect to inaccessible courthouses); Barnes v. Gorman, 536 U.S. 181, 185, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002) (stating that Title II and § 504 of the Rehabilitation Act “are enforceable through private causes of action”); Olmstead, 527 U.S. at 597, 119 S.Ct. 2176 (holding that mentally disabled plaintiffs could sue state health officials under Title II to receive community-based treatment); Penn. Dep’t of Corr. v. Yeskey, 524 U.S. 206, 210, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (holding that prisoner could sue state prison under Title II to gain admission to motivational boot camp); McCarthy ex rel. Travis v. Hawkins, 381 F.3d 407, 415 n. 9 (5th Cir.2004) (noting that "both Title II and § 504 are enforceable directly through private causes of action”).

. See Alexander v. Sandoval, 532 U.S. 275, 285, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

. Id. at 284-85, 121 S.Ct. 1511 (citing Rehabilitation Act regulations).

. See Yeskey, 524 U.S. at 210, 118 S.Ct. 1952 (analyzing the plain meaning of "benefits of the services, programs, or activities of a public entity” in determining the plaintiff’s right to sue under Title II); Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 178, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005) (holding that the implied private right of action to enforce Title IX of the Education Amendments of 1972 encompasses suits for retaliation "based on the statute's text”); cf. Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ("[0]ur cases considering the scope of conduct prohibited by § 10(b) [of the Securities Exchange Act of 1934] in private suits have emphasized adherence to the statutory language, the starting point in every case involving construction of a statute.” (citation, quotation marks, and brackets omitted)).

. K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988).

. See 42 U.S.C. § 12134(a).

. Olmstead, 527 U.S. at 598-99, 119 S.Ct. 2176.

. See Alexander v. Choate, 469 U.S. 287, 305 n. 24, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (recognizing that “those charged with administering [the Rehabilitation Act] ha[ve] substantial leeway to explore areas in which discrimination against the handicapped posed particularly significant problems and to devise regulations to prohibit such discrimination”); see also Chevron, U.S.A., Inc. v. Nat’l Res. Def. Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (holding that when “Congress has explicitly left a gap for the agency to fill ... [s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute”).

. 42 U.S.C. § 12132. There is no dispute that the plaintiffs are qualified individuals with disabilities, nor that the City is a “public enüty” within the meaning of Title II. For reference, a "qualified individual with a disability” means “an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.” Id. § 12131(2). A “public entity” means, inter alia, any local government, or any department, agency, or instrumentality of a local government. Id. § 12131 (1)(A), (B).

. 524 U.S. at 213, 118 S.Ct. 1952.

. Id. at 210, 118 S.Ct. 1952.

. Id. at 212, 118 S.Ct. 1952.

. Id.

. 29 U.S.C. § 794(b)(1)(A).

. See Choate, 469 U.S. at 301, 105 S.Ct. 712 ("The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled

. Holder v. Humanitarian Law Project, - U.S. -, 130 S.Ct. 2705, 2721-22, 177 L.Ed.2d 355 (2010) (quoting Webster’s Third New International Dictionary 2075 (1993)).

. Webster’s Third New International Dictionary 2075 (1993).

. Black’s Law Dictionary 1352 (9th ed. 2009).

. See, e.g., Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 768, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (“The state also has a strong interest ... in promoting the free flow of traffic on public streets and sidewalks .... ”); Int'l Soc’y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 696-97, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (Kennedy, J„ concurring) (observing that "the principal purpose of streets and sidewalks ... is to facilitate transportation”); Schneider v. State of N.J., Town of Irvington, 308 U.S. 147, 160, 60 S.Ct. 146, 84 L.Ed. 155 (1939) ("Municipal authorities, as trustees for the public, have the duty to keep their communities’ streets open and available for movement of people and property, the primary purpose to which the streets are dedicated.”).

. See supra, n. 38.

. Cf. Delano-Pyle v. Victoria Cnty., Tex., 302 F.3d 567, 574-75 (5th Cir.2002) (holding that "when a plaintiff asserts a cause of action against an employer-municipality, under either the ADA or the RA, the public entity is liable for the vicarious acts of any of its employees”); Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1141 (9th Cir.2001) (similar); McCarthy, 381 F.3d at 413-14 (holding that a state official may be sued in his official capacity for prospective relief under Title II); Henrietta D. v. Bloomberg, 331 F.3d 261, 289 (2d Cir.2003) (same).

. Webster’s Third New International Dictionary 1581 (1993).

. For its part, Arlington publicizes that it "rebuild[s] sidewalks” through a "program” administered by the Arlington "Department of Public Works Services.” City of Arlington, Questions and Answers — Traffic, Streets & Transportation, http://www.arlingtontx.gov/ cityhalVqna_traffic.html (last visited July 25, 2011). Although perhaps not dispositive, the City’s characterization of its own programs and services is at least relevant to this case. Cf. Yeskey, 524 U.S. at 210, 118 S.Ct. 1952 (noting that “the statute establishing the Motivational Boot Camp at issue in this very case refers to it as a ‘program’ ”).

. See supra, n. 39.

. See supra, n. 38.

. Everson v. Bd. of Educ. of Ewing, 330 U.S. 1, 17-18, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

. Comm, for Pub. Educ. & Religious Liberty v. Nyquist, 413 U.S. 756, 781-82, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).

. Everson, 330 U.S. at 17-18, 67 S.Ct. 504.

. Boos v. Barry, 485 U.S. 312, 318, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (observing that "sidewalks” are "traditional public fora that ‘time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions’ ”); Fairchild v. Liberty Indep. Sch. Dist., 597 F.3d 747, 757-58 (5th Cir.2010) (recognizing same).

. 42 U.S.C. § 12134(a); see also 28 C.F.R. § 35.101 (2010) ("The purpose of this part is to effectuate subtitle A of title II of the [ADA], which prohibits discrimination on the basis of disability by public entities.”). DOJ’s regulations were amended effective March 11, 2011. The parties do not assert that the amended regulations apply to this case, and we assume that the earlier regulations continue to apply.

. 42 U.S.C. § 12134(b). The coordination regulations "implement Executive Order 12250, which requires the [DOJ] to coordinate the implementation of section 504 of the Rehabilitation Act” among federal agencies. 28 C.F.R. § 41.1.

. 28 C.F.R. § 41.58(a) (requiring new facilities to be accessible, and altered facilities to be accessible "to the maximum extent feasible”); id. § 41.3(f) (defining "facility” to include "roads, walks, [and] parking lots”).

. 42 U.S.C. § 12201(a) (requiring that “nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 ... or the regulations issued by Federal agencies pursuant to such title”).

. Bragdon, 524 U.S. at 632, 118 S.Ct. 2196.

. 42 U.S.C. §§ 12146-47; see also H.R.Rep. No. 101-485(11), at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 366 (noting that the purpose of Part B of Title II "is to clarify the requirements of section 504 [of the Rehabilitation Act] ... and to extend coverage to all public entities that provide public transportation, whether or not such entities receive Federal aid”).

. 49 C.F.R. § 37.3.

. 42U.S.C. § 12131(2).

.See Choate, 469 U.S. at 301, 105 S.Ct. 712 (finding that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers").

. See 42 U.S.C. § 12101(a)(5) (finding that disabled individuals suffer from various forms of discrimination, including the discriminatory effects of transportation barriers).

. H.R.Rep. No. 101-485(11), at 84, 1990 U.S.C.C.A.N. at 367.

. 42 U.S.C. § 12101(a)(2), (5); see also Olmstead, 527 U.S. at 600, 119 S.Ct. 2176 ("Congress explicitly identified unjustified ‘segregation’ of persons with disabilities as a ’for[m] of discrimination.’ ”); id. at 613-14, 119 S.Ct. 2176 (Kennedy, J., concurring in part and concurring in the judgment) ("I deem it relevant and instructive that Congress in express terms identified the ‘isolation] and segregation]’ of disabled persons by society as a ’for[m] of discrimination’ ....”); cf. Choate, 469 U.S. at 295, 105 S.Ct. 712 (recognizing that "[discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference — of benign neglect”); id. at 296, 105 S.Ct. 712 (recognizing that "discrimination against the handicapped is primarily the re-suit of apathetic attitudes rather than affirmative animus”).

. 42 U.S.C. § 12101(a)(3); see also H.R.Rep. No. 101-485(11), at 37, 1990 U.S.C.C.A.N. at 319 (recognizing that inaccessible transportation is "the major barrier" to work for disabled individuals, and ”[p]eople who cannot get to work ... cannot exercise their rights and obligations as citizens”).

. H.R.Rep. No 101-485(11), at 37.

. 42 U.S.C. § 12101(a)(8); see also H.R.Rep. No. 101-485(11), at 43, 1990 U.S.C.C.A.N. at 325 (recognizing that dependency "is a major and totally unnecessary contributor to public deficits and private expenditures” and costs society "literally billions of dollars annually in support payments and lost income tax revenues”); id. at 44, 1990 U.S.C.C.A.N. at 326 (recognizing that disability discrimination "deprives our nation of a critically needed source of labor”).

. Id. at 43-44, 1990 U.S.C.C.A.N. at 325-26.

. See, e.g., 29 U.S.C. § 701(b)(1) (stating that the "purposes of this chapter ... are ... to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society, through ... the guarantee of equal opportunity”).

. Olmstead, 527 U.S. at 613, 119 S.Ct. 2176 (Kennedy, J., concurring in part and concurring in the judgment) (brackets omitted).

. Lane, 541 U.S. at 531, 124 S.Ct. 1978.

. Olmstead, 527 U.S. at 603, 119 S.Ct. 2176 (plurality).

. 541 U.S. at 532-33, 124 S.Ct. 1978; see also Choate, 469 U.S. at 301, 105 S.Ct. 712 (suggesting Rehabilitation Act requires “meaningful access” and “reasonable accommodations”); Brennan v. Stewart, 834 F.2d 1248, 1261 (5th Cir.1988) (recognizing same). We express no opinion as to whether (or when) a failure to make reasonable accommodations should be considered a form of intentional discrimination, a form of disparate impact discrimination, or something else entirely.

. 28 C.F.R. § 35.151(a); id. § 35.104 (defining a “facility” to include, inter alia, "roads, walks, passageways, [and] parking lots”).

. See H.R.Rep. No. 101-485(11), at 36, 1990 U.S.C.C.A.N. at 317 (recognizing that “newly constructed build-ups should be fully accessible because the additional costs for making new facilities accessible are often nonexistent or negligible”).

. 28 C.F.R. § 35.151(b).

. See H.R.Rep. No. 101-485(11), at 36, 1990 U.S.C.C.A.N. at 318 (recognizing that "[i]f accessibility is part of the planning from the onset of a project, then that access costs no more or at the most marginally more than a project with no access”).

. Lane, 541 U.S. at 532, 124 S.Ct. 1978; see also 28 C.F.R. §§ 35.130(b)(7), 35.150(a)(2)-(3), (b)(1), 35.151(b), (d).

. 541 U.S. at 531, 124 S.Ct. 1978.

. Id. at 532, 124 S.Ct. 1978.

. 469 U.S. at 302 n. 21, 105 S.Ct. 712.

. Id. (citing 45 C.F.R. § 84.23 (1984)).

. 385 F.3d 901, 906-07 (6th Cir.2004).

. 292 F.3d 1073, 1076 (9th Cir.2002).

. 9 F.3d at 1069.

. 348 F.3d 850, 861 (10th Cir.2003).

. Sandoval, 532 U.S. at 285, 121 S.Ct. 1511.

. Cf. Olmstead, 527 U.S. at 604, 119 S.Ct. 2176 (plurality) (finding that a state may "show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable,” "taking into account the resources available to the State and the needs of others with mental disabilities”); id. at 607, 119 S.Ct 2176 (Stevens, J., concurring in part and concurring in the judgment) (“If a plaintiff requests relief that requires modification of a State’s services or programs, the State may assert, as an affirmative defense, that the requested modification would cause a fundamental alteration of a State's services and programs.”).

. See, e.g., United States v. Criminal Sheriff, Parish of Orleans, 19 F.3d 238, 239 (5th Cir. 1994); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Lane, Federal Practice and Procedure § 2942 (2d ed.); cf. Watson v. City of Memphis, 373 U.S. 526, 529-31, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963).

. 616 F.3d at 488.

. See Yeskey, 524 U.S. at 210, 118 S.Ct. 1952 (noting that "[t]he text of the ADA provides no basis for distinguishing” the programs, services, and activities of a public entity in one context from those provided in other contexts).

. See 28 C.F.R. § 41.3(f) (defining "facility” to include "road, walks, [and] parking lots”).

. 28 C.F.R. §§ 35.130, 35.150.

. Id. § 35.151.

. Id. §§ 35.149, 35.150(a).

. Id. § 35.150(b)(1).

.We observe that DOJ was given authority only to “implement” § 12132. If a "facility” could never be a "service, program, or activity” within the meaning of § 12132, then § 35.151 would go beyond what § 12132 requires in most circumstances. It would be bizarre to conclude that DOJ interprets § 12132 in a way that calls into question the validity of its own regulations. See Sandoval, 532 U.S. at 282, 121 S.Ct. 1511 (noting "considerable tension” in agency regulations that go beyond their statutory mandate); id. at 286 n. 6, 121 S.Ct. 1511 (observing "how strange it is to say” that regulations may prohibit conduct that the statute permits).

. See Br. for United States as Intervenor and Amicus Curiae at 72-78, Mason v. City of Huntsville, Ala., No. 10-S-2794 (N.D. Ala. June 10, 2011); Br. for United States as Amicus Curiae at 9-16, Barden v. City of Sacramento, 292 F.3d 1073 (9th Cir.2002) (No. 01-15744), 2001 WL 34095025 at *9-16; Br. for United States as Amicus Curiae at 14, Kinney v. Yerusalem, 9 F.3d 1067 (3d Cir. 1993) (No. 93-1168), 1993 WL 13120087, at *14.

. Compare Olmstead, 527 U.S. at 597-98, 119 S.Ct. 2176 (finding that DOJ’s views as to the meaning of Title II at least "warrant respect” when DOJ has "consistently advocated" its position in other briefing), and Auer v. Robbins, 519 U.S. 452, 462-63, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (deferring to agency's interpretation of its own regulations as presented in a legal brief), with Janus Capital Grp., Inc. v. First Derivative Traders,-U.S. - n. 8, 131 S.Ct. 2296, 2304 n. 8, 180 L.Ed.2d 166 (2011) (expressing "skepticism” over the "degree” to which an agency should receive deference regarding the scope of a private right of action).

. 616 F.3d at 484 n. 9.

. 42 U.S.C. § 12101(b)(2).

. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citation and quotation marks omitted).

. Id. at 564, 112 S.Ct. 2130.

. Id. at 564 n. 2, 112 S.Ct. 2130.

. See "Walker v. City of Mesquite, 169 F.3d 973, 979 (5th Cir.1999) (finding homeowners had standing to enjoin new construction of public housing projects near their neighborhoods).

. See, e.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 183-84, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (distinguishing Lujan and finding standing based on plaintiffs' assertions that they would use river but for the defendant’s pollution); Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) ("[0]ne does not have to await the consummation of threatened injury to obtain preventative relief. If the injury is certainly impending, that is enough.”); Disabled Ams. for Equal Access, Inc. v. Ferries Del Caribe, Inc., 405 F.3d 60, 64 (1st Cir. 2005) (finding standing even though disabled plaintiff had not traveled aboard noncompliant ferry); Pickem v. Holiday Quality Foods Inc., 293 F.3d 1133, 1136-37 (9th Cir.2002) ("Once a plaintiff has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from visiting or patronizing that accommodation, the plaintiff has suffered an injury.”).

. 28 U.S.C. § 2403(a); Haas v. Quest Recovery Servs., Inc., 549 U.S. 1163, 1163, 127 S.Ct. 1121, 166 L.Ed.2d 888 (2007) (vacating and remanding to court of appeal "to consider the views of the United States” as to whether Title II validly abrogated state sovereign immunity).

. 28 U.S.C. § 1658(a).

. Pub.L. No. 101-336 § 205(a) (1990).

. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004).

. N. Star Steel Co. v. Thomas, 515 U.S. 29, 34, 115 S.Ct. 1927, 132 L.Ed.2d 27 (1995); Wilson v. Garcia, 471 U.S. 261, 266-67, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); see also 28 U.S.C. § 1652.

. N. Star, 515 U.S. at 35, 115 S.Ct. 1927 (quoting Reed v. United Trans. Union, 488 U.S. 319, 325, 109 S.Ct. 621, 102 L.Ed.2d 665 (1989)).

. Id.

. See Tex. Civ. Prac. & Rem.Code Ann. § 16.003 (''[A] person must bring suit for ... personal injury ... not later than two years after the day the cause of action accrues.”).

. See Hickey v. Irving Indep. Sch. Dist., 976 F.2d 980, 983 (5th Cir. 1992); cf. Holmes v. Tex. A&M Univ., 145 F.3d 681, 684 (5th Cir. 1998) (assuming Texas's two-year personal-injury limitations period applied to claims under Title II).

. See, e.g., Bishop v. Children’s Ctr. for Dev. Enrichment, 618 F.3d 533, 536 (6th Cir.2010); Disabled in Action of Penn. v. Se. Penn. Trans. Auth., 539 F.3d 199, 208 (3d Cir.2008); Gaona v. Town & Country Credit, 324 F.3d 1050, 1055 (8th Cir.2003); Everett v. Cobb Cnty. Sch. District., 138 F.3d 1407, 1409 (11th Cir. 1998); Soignier v. Am. Bd. of Plastic Surgery, 92 F.3d 547, 551 (7th Cir. 1996); cf. Wilson, 471 U.S. at 276, 105 S.Ct. 1938 (finding that § 1983 claims are best characterized as personal injury actions for purposes of determining limitations period).

. Goodman v. Lukens Steel Co., 482 U.S. 656, 661, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); Wilson, 471 U.S. at 277, 105 S.Ct. 1938 ("Congress unquestionably would have considered the remedies established in the Civil Rights Act to be more analogous to tort claims for personal injury than, for example, to claims for damages to property or breach of contract.”).

. In selecting Texas’s personal-injury limitations period, we note that Texas has not adopted a general disability-discrimination law modeled on Title II or the Rehabilitation Act. Texas does prohibit disability discrimination in employment and housing, see Tex. Lab. Code Ann. § 21.051; Tex. Prop.Code Ann. *238 § 301.025, but the former is not analogous to Title II or the Rehabilitation Act as applied to this case, and the latter is, in any event, subject to a two-year limitations period. See id. § 301.151(a).

. See Wallace v. Kato, 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007); Walker v. Epps, 550 F.3d 407, 414 (5th Cir. 2008).

. Although it may be "theoretically possible for a statute to create a cause of action that accrues at one time for the purpose of calculating when the statute of limitations begins to run, but at another time for the purpose of bringing suit,” the Supreme Court has admonished that we should "not infer such an odd result in the absence of any such indication in the statute.” Reiter v. Cooper, 507 U.S. 258, 267, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). In other words, "[u]nless Congress has told us otherwise in the legislation at issue, a cause of action does not become 'complete and present’ for limitations purposes until the plaintiff can file suit and obtain relief.” Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997). We see no indication in Title II or § 504 of the Rehabilitation Act that Congress intended the plaintiffs' cause of action to accrue before they could file suit.

. Wallace, 549 U.S. at 388, 127 S.Ct. 1091 (citations and quotation marks omitted); see also Bay Area Laundry, 522 U.S. at 201, 118 S.Ct. 542.

. Epps, 550 F.3d at 414.

. Lujan, 504 U.S. at 564, 112 S.Ct. 2130.

. See Melton v. Dallas Area Rapid Transit, 391 F.3d 669, 671-72 (5th Cir.2004) (stating that plaintiff must demonstrate he is a qualified individual with a disability as part of prima facie case).

. See 42 U.S.C. § 12132(a)(2).

. This case does not present the issue of money damages, and we do not reach the issue. We have held, however, that money damages are available under Title II and § 504 only for intentional discrimination. See Delano-Pyle, 302 F.3d at 575; cf. Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 284, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (finding that courts have "a measure of latitude” to determine "when it is appropriate to award monetary damages” for violations of Title IX of the Education Amendments of 1972). The class of cases in which money damages will be available for inaccessible sidewalks thus would appear to be small.

. F.T.C. v. Nat’l Bus. Consultants, Inc., 376 F.3d 317, 320 (5th Cir.2004); In re Hinsley, 201 F.3d 638, 644-45 (5th Cir.2000); Fed. R.Civ.P. 8(c).

. See TIG Ins. Co. v. Aon Re, Inc., 521 F.3d 351, 357 (5th Cir.2008) (noting that "federal law governs the pleading requirements of a case in federal court”).

. See Simpson v. James, 903 F.2d 372, 375 (5th Cir.1990).

. Jones v. Bock, 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).