Jane DOE 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Jane Doe 5, Jane Doe 6, Jane Doe 7, Jane Doe 8, Jane Doe 9, and Jane Doe 10, Plaintiffs,

v.

BAYLOR UNIVERSITY, Defendant.

6:16–CV–173–RP

United States District Court, W.D. Texas, Waco Division.

Signed 03/07/2017

Chad W. Dunn, K. Scott Brazil, Brazil & Dunn, Houston, TX, James R. Dunnam, Dunnam, Dunnam, et al., Waco, TX, for Plaintiffs.

Holly Gene McIntush, Thompson & Horton, LLP, Julie A. Springer, Sara E. Janes, Weisbart Springer Hayes, LLP, Austin, TX, Lisa Ann Brown, Thompson & Horton LLP, Houston, TX, for Defendant.

## ORDER

ROBERT PITMAN, UNITED STATES DISTRICT JUDGE

Each of the ten plaintiffs in this case allege that while they were students at Baylor University they were sexually assaulted by another student, but that when they sought assistance and protection from Baylor, the school did nothing (or almost nothing) in response to their reports. Plaintiffs allege Baylor discouraged them from reporting their assaults, failed to adequately investigate each of the assaults, and failed to ensure Plaintiffs would not be subjected to continuing assault and harassment. Plaintiffs assert that Baylor's practices in handling their reports reflect the school's widespread practice of mishandling reports of peer sexual assault. They allege these practices chilled other students from reporting sexual harassment, permitted the creation of a campus condition "rife with sexual assault," "substantially increased Plaintiffs' chances of being sexually assaulted," (Third Am. Compl., Dkt. 56, at 1–2, ¶ 29), and ultimately created a harassing educational environment that deprived Plaintiffs of a normal college education and other educational opportunities.

Plaintiffs seek to hold Baylor liable under Title IX of the Education Amendments of 1972 ("Title IX"). Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from partic-

ipation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

At this stage of litigation, the Court considers only whether Plaintiffs' Complaint contains sufficient factual matter, if accepted as true, to state a claim to relief that is plausible on its face. Baylor attempts to disclaim liability by dismissing Plaintiffs' allegations as "an amalgam of incidents that involved completely different contexts, offenders, and victims," (Def.'s Mot. Dismiss Doe 7, Dkt. 62, at 21), and arguing that "evidence of a general problem of sexual violence is not sufficient," (*id.* at 22). This Court disagrees. Plaintiffs have not alleged that Baylor had knowledge of accusations against their specific assailants prior to their initial assaults, but what they have alleged—a widespread pattern of discriminatory responses to female students' reports of sexual assault—is arguably more egregious. Indeed, even those Supreme Court justices who expressed skepticism regarding holding institutions liable for sexual assaults on individual students under Title IX have suggested that "a clear pattern of discriminatory enforcement of school rules could raise an inference that the school itself is discriminating." *Davis v. Monroe Cty. Bd. Educ.*, 526 U.S. 629, 683, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (Kennedy, J., dissenting). In particular they noted that a "school's failure to enforce its rules when the boys target the girls on a widespread level, day after day, may support an inference that the school's decision not to respond is itself based on gender" and thereby be actionable under Title IX. *Id.*

## I. STANDARD OF REVIEW

■ Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the [plaintiffs'] grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.' " *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

## II. FACTUAL BACKGROUND

Plaintiffs are ten women who were students at Baylor at the time of the events at issue in this lawsuit. (Third Am. Compl., Dkt. 56, ¶¶ 1–10). Nine lived in housing owned or operated by the university. Each Plaintiff alleges a sexual assault that took place between 2004 and 2016. Each Plaintiff also alleges that she reported her assault to—and was met with an indifferent and inadequate response from—the Baylor counseling center, the Baylor police department, university medical personnel, or another student services office. Taken together, Plaintiffs allege, these facts demonstrate Baylor created a condition that substantially increased Plaintiffs' chances of being sexually assaulted, (*id.* at 1); chilled student reporting of sexual harassment, (*id.* ¶ 41); led to a sexually hostile environment at the university, (*id.* ¶ 43); caused Plaintiffs psychological damage and distress, (*id.* ¶ 48); and deprived Plaintiffs of a normal college education, (*id.* ¶ 50).

Specifically, each Plaintiff in this matter makes the following individual allegations:

Jane Doe 1 ("Doe 1"), who enrolled at Baylor in January 2014, alleges she was sexually assaulted by a player on the university's football team on April 26, 2014, at University Parks, an on-campus residence hall. (*Id.* ¶¶ 52–56). She alleges that upon reporting the assault to a university physician approximately two days later, the physician misinformed her and concealed information about additional reporting options, accommodations available under Title IX, and the availability of investigatory actions that could be undertaken by the university. (*Id.* ¶¶ 57–58). Doe 1 again reported the assault during the final exam period, but no official action was taken by the university. (*Id.* ¶ 59). As a result, she alleges, she was subject to repeated on-campus encounters with her assailant. (*Id.* ¶¶ 63–64). She developed severe anxiety and depression, leading to a decline in her academic performance and the withdrawal of her scholarship funds. (*Id.* ¶¶ 62, 65–67).

Jane Doe 2 ("Doe 2"), who enrolled at Baylor in August 2004, alleges she was assaulted at a house near campus on September 4, 2004. (*Id.* ¶¶ 72, 75–76). She first reported the sexual assault a few days later to the chaplain at her on-campus residence, Collins Hall; the dorm hall director was also informed. (*Id.* ¶¶ 77–78). The Baylor Police Department responded, but Doe 2 alleges that the officer with whom she interacted misinformed her about the consequences of filing a report and discouraged her from naming her assailant. (*Id.* ¶¶ 79–80). Doe 2 subsequently reported the incident to personnel at the Baylor Health Center, who conducted a physical exam but did not prepare a rape kit. (*Id.* ¶ 83). She subsequently and repeatedly encountered her assailant on-campus, (*id.* ¶¶ 85–86), and one such incident led her to inform an assistant dean, (*id.* ¶ 86). The university provided free counseling sessions for a time, but did not provide assistance once Doe 2 exhausted the number of sessions generally allocated to students. (*Id.* ¶ 88). Because of Baylor's actions, Doe 2 alleges, she experienced intense fear, nightmares, and a decline in academic performance that led to her suspension and the loss of her scholarship funds and financial aid. (*Id.* ¶¶ 85, 89–90).

Jane Doe 3 ("Doe 3"), who enrolled at Baylor in the fall of 2012, alleges she was sexually harassed and assaulted by a fellow residence hall staff member starting in the fall of 2013 and continuing through December 2015. (*Id.* ¶¶ 104, 107). She reported the assaults to the university counseling and health centers and ultimately informed the Baylor Police Department. (*Id.* ¶¶ 114, 118). Her university physician misinformed her about her reporting options, Title IX accommodations, and investigatory actions that could be undertaken by the university, and the university did not provide assistance once she exhausted the number of counseling sessions generally available to students. (*Id.* ¶¶ 113, 119). As a result, her academic performance suffered and her physical and mental health were severely impaired. (*Id.* ¶¶ 115, 120).

Jane Doe 4, who enrolled at Baylor in the fall of 2011, alleges she was sexually assaulted by another student on April 7, 2014. (*Id.* ¶¶ 121, 124–25). She first reported the assault to Baylor in June 2014, when she informed staff at the university's counseling center. (*Id.* ¶¶ 128–29). Despite providing Baylor with her assailant's name, repeatedly interacting with the counseling center, and reporting the incident to Baylor Judicial Affairs, Doe 4 was not informed of any potential accommodations available under Title IX, and no action was taken against her assailant. (*Id.* ¶¶ 130–32). This was true even after Doe 4 informed a Baylor counselor that she encountered her assailant on campus, caus-

ing her emotional and physical distress. (*Id.* ¶ 135–37). As a result of her assault and the university's response, Doe 4's physical and mental health were severely impaired, (*id.* ¶¶ 126, 135–36, 143), and her academic performance suffered, (*id.* ¶¶ 138–142).

Jane Doe 5 ("Doe 5") enrolled at Baylor in the fall of 2005; she alleges she was sexually assaulted by a fellow student in an on-campus residence hall in mid–November of the same year. (*Id.* ¶¶ 146, 152–53). She reported the assault to a physician at the university medical clinic shortly thereafter. (*Id.* ¶¶ 154–55). While the physician performed an HIV test at Doe 5's request, the physician made no inquiries about the sexual assault. (*Id.* ¶ 156). Doe 5 subsequently reported the incident to the university counseling center, where a counselor advised her not to come forward. (*Id.* ¶¶ 160–61). When Doe 5 reported the incident to the Waco Police Department in February 2006, she was told an investigation would not be conducted because too much time had elapsed since the assault. (*Id.* ¶ 162). As a result of the assault, an on-campus encounter with her assailant, and her post-assault interactions with Baylor and its staff, Doe 5's physical and mental health were severely impaired. (*Id.* ¶¶ 167, 175). Her academic performance suffered, resulting in the loss of her financial aid, and she eventually transferred to another university. (*Id.* ¶¶ 172–73).

Jane Doe 6 ("Doe 6") enrolled at Baylor in the fall of 2005. She alleges she was the victim of a drug-facilitated sexual assault by a fellow student during her junior year. (*Id.* ¶¶ 177–79). She initially reported the assault to a professor, who took no action aside from allowing her to re-take a missed exam. (*Id.* ¶¶ 180–81). She then reported the assault to a physician, who performed a rape examination and confirmed that forcible sexual intercourse had occurred. (*Id.* ¶¶ 182–83).

When she reported the incident to the Baylor police, however, they refused to take a report. (*Id.* ¶ 184). Doe 6 was never informed of any potential accommodations. (*Id.* ¶ 185). She sent a letter to the president of the university regarding its handling of her reported assault, but did not receive a response. (*Id.* ¶ 188). Doe 6, who paid for counseling without assistance from Baylor, alleges that her higher education experience, physical and mental health, and general well-being were substantially and severely impaired by her assault and subsequent treatment by the university. (*Id.* ¶ 187).

Jane Doe 7 ("Doe 7"), who enrolled at Baylor in the fall of 2008, alleges she was assaulted by two fellow students in May 2009. (*Id.* ¶¶ 191–92). The next day, she reported the incident to a Baylor employee and saw a physician who performed a rape examination. (*Id.* ¶¶ 194–95). She reported the incident to several individuals, including staff at the university counseling center, the following week. (*Id.* ¶¶ 196–97). She was never informed of any potential accommodations, was denied accommodations she directly requested, and was not offered any counseling services beyond the limited free sessions generally allotted to students. (*Id.* ¶¶ 198–99, 205). Doe 7, who encountered her assailants on a daily basis for two years, developed depression and anxiety. (*Id.* ¶¶ 204, 206). Her academic performance suffered, and she alleges that her higher education experience was substantially impaired. (*Id.* ¶¶ 201–02, 207–09).

Jane Doe 8 ("Doe 8") enrolled at Baylor in the fall of 2012. (*Id.* ¶ 210). She alleges she was assaulted by a fellow student in March of 2015. (*Id.* ¶¶ 211–12). She reported the assault to a roommate, who reported to a professor; that professor then reported the assault to the university's Title IX office, which contacted Doe 8 via email. (*Id.* ¶¶ 213–15). The Title IX advised

Doe 8 that she had the option to report, but did not otherwise inform her of her rights. (*Id.* ¶ 216). Doe 8 reported the assault to the university counseling center in June 2015, but was referred to outside counseling services. (*Id.* ¶¶ 217–20). She then contacted the Title IX office and met with the Title IX coordinator, the Baylor police department, and the university's human resources department.[1] (*Id.* ¶¶ 223–25). The Title IX office discouraged Doe 8 from requesting a traditional Title IX hearing, the police department misinformed her and discouraged her from pursuing her claims, and the human resources department took no action. (*Id.* ¶¶ 226–29). As a result of her assault and the university's response, Doe 8 suffered severe physical and mental health impairments and experienced a substantially impaired higher education environment. (*Id.* ¶¶ 231–32).

Jane Doe 9 ("Doe 9"), an on-campus resident who enrolled at Baylor in January 2014, alleges she was sexually assaulted by a fellow student in November 2014. (*Id.* ¶¶ 233–36). She reported the incident to Baylor Judicial Affairs, which lectured her on drinking but failed to refer her to the Title IX office or counseling center, offer her accommodations, or take a written report. (*Id.* ¶ 238). She subsequently sought assistance at the university counseling center, which advised her to seek off-campus assistance. (*Id.* ¶ 244). Prior to the Fall 2016 semester, Doe 9 met with staff at the Office of Learning Accommodations, who suggested she report to the Title IX office. (*Id.* ¶ 247). She did so, and although a criminal investigation was initiated, no ser-

vices or accommodations were offered. (*Id.*). Doe 9 has faced on-campus encounters with her assailant for almost two years and has suffered severe physical and mental health impairments, including panic attacks and shingles. (*Id.* ¶¶ 239, 243, 245, 248–49). Her academic performance suffered, and she alleges that her higher education experience was substantially impaired. (*Id.* ¶¶ 240–41, 250).

Jane Doe 10 ("Doe 10"), who enrolled at Baylor in August 2013, alleges she was sexually assaulted in February 2016. (*Id.* ¶¶ 251, 253–54). She reported the assault to the Waco Police Department the same day; the Baylor police department and Title IX office were also informed. (*Id.* ¶¶ 255–56). Doe 10 requested that the Title IX office open an investigation; it did so, but discouraged her participation. (*Id.* ¶¶ 257–60). As a result, Doe 10 alleges, her physical and mental health, general well-being, and higher education experience were severely and substantially impaired. (*Id.* ¶ 261).

In addition to the specific facts alleged above, Plaintiffs note that Baylor did not have a full-time Title IX coordinator until November 2014. (*Id.* ¶ 47). Moreover, despite the assaults reported to Baylor by Plaintiffs and others, Baylor claimed to the U.S. Department of Education that zero incidents of sexual assault took place on its campus between 2008 and 2011.[2] (*Id.* ¶ 40).

### III. TITLE IX

Title IX of the Education Amendments of 1972 prohibits discrimina-

---

1. Doe 8's assailant became an employee of Defendant between her alleged assault and the time this meeting took place. (*Id.* ¶ 222).

2. The alleged assaults at issue in the instant case took place between 2004 and 2016. (*See generally* Third Am. Compl., Dkt. 56). Furthermore, as noted on a website cited by Plaintiffs in the Third Amended Complaint, a

Baylor student was criminally charged with the sexual assault of a fellow student in May 2011. Waco Tribune–Herald, *Timeline: Baylor Sexual Assault Controversy*, http://www.wacotrib.com/news/higher_education/timeline-baylor-sexual-assaultcontroversy/article_abf21ab8-2267-51bf-84d8-6268f4222af0.htm.

tion on the basis of sex in all federally-funded educational programs. 20 U.S.C. § 1681(a). Specifically, it provides:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

*Id.* When Congress first passed Title IX more than forty years ago, it had two related objectives: first, Congress wanted to prevent federal funds from being used to support discriminatory practices; second, it wanted to provide individuals "effective protection against those practices." *Cannon v. Univ. of Chic.*, 441 U.S. 677, 704, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *see also* 118 Cong. Rec. 5730 (1972) (statement of Senator Birch Bayh) ("The amendment we are debating is a strong and comprehensive measure which I believe is needed if we are to provide women with solid legal protection as they seek education and training for later careers.... As a matter of principle, our national policy should prohibit sex discrimination at all levels of education."). When private universities like Baylor accept funding through various federal programs, including by enrolling students who receive federal funds to pay for their education, they become subject to the requirements of Title IX. *See Nat'l Collegiate*

*Athletic Ass'n v. Smith*, 525 U.S. 459, 466, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999).

■ Title IX is enforceable through an individual's private right of action and allows for the recovery of damages. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (citing *Cannon*, 441 U.S. 677, 99 S.Ct. 1946 and *Franklin v. Gwinnett Cty. Public Schs.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)). The recognition of this private right of action has given rise to two general avenues for Title IX claims. The distinction between these two avenues for Title IX claims—one for claims based on an official policy of discrimination and the other for claims based on an institution's actual notice of and deliberate indifference to sexual harassment or assault—is particularly relevant here because Plaintiffs use both avenues to advance their claims.

■ The first avenue is for claims involving an official policy of intentional discrimination by an institution.[3] *See Franklin*, 503 U.S. at 75, 112 S.Ct. 1028 (distinguishing claims alleging "intentional discrimination" by an institution from those claims seeking to hold an institution liable for the discriminatory acts of an individual); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (distinguishing claims involving an "official policy" of

---

**3.** Neither the Fifth Circuit nor the Supreme Court has directly addressed whether discrimination must be intentional to sustain a private right of action under Title IX. The Supreme Court has concluded, however, that Title VI, on which Title IX is patterned, prohibits only intentional discrimination. *See Alexander v. Sandoval*, 532 U.S. 275, 280–81, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 408 (5th Cir. 2015). Most courts that have considered whether Title IX allows a disparate impact claim have held that it does not. *See, e.g., Nat'l Wrestling Coaches Ass'n v. Dep't*

*of Educ.*, 366 F.3d 930, 946 (D.C. Cir. 2004); *Manley v. Tex. Southern Univ.*, 107 F.Supp.3d 712, 726 (S.D. Tex. 2015); *Weser v. Glen*, 190 F.Supp.2d 384, 395 (E.D.N.Y. 2002), *aff'd*, 41 Fed.Appx. 521 (2d Cir. 2002). Here, while Plaintiffs state that Baylor's actions had a disparate impact on female students at Baylor, including Plaintiffs, they also repeatedly allege that Baylor's actions "stem from discriminatory intent." (Pl.'s Resp., Dkt. 22, at 29). The Court therefore presumes without deciding that intentional discrimination is required for a Title IX claim.

discrimination from those seeking to hold an institution liable for the discriminatory acts of an individual). These claims typically allege a policy of sex discrimination by a school or university in admissions, scholarship administration, or athletic programing.[4] *See, e.g., Pederson v. La. State Univ.*, 213 F.3d 858, 879–82 (5th Cir. 2000) (identifying an intentional violation of Title IX after a university disbanded the women's fast-pitch softball team despite many female students' interest and ability in the sport and noting that the proper test for determining whether an intentional violation has occurred is whether an instituted "intended to treat [students] differently on the basis of their sex").

■■■■ The second avenue for Title IX claims is typically used for claims of sexual harassment or assault. The Supreme Court has held that sexual harassment within a school or school program is a form of sex discrimination when the harassment is so severe, pervasive, and objectively offensive that it deprives the victim of educational opportunities or benefits provided by the school. *Davis*, 526 U.S. at 650, 119 S.Ct. 1661. A school can be held liable for such harassment when it is deliberately indifferent to harassment of which it has actual knowledge. *Id.* This is true regardless of whether the harasser is an employee of the school or another student, but liability under this avenue is limited to circumstances in which the school "exercises substantial control over both the harasser and the context" in which the harassment occurs. *Id.* at 645, 119 S.Ct. 1661. This framework for liability in sexual harassment cases ultimately serves as a proxy for the showing of intentional discrimination that is otherwise required for Title IX claims. Thus, while the school is not itself committing the sexual harassment, it can be said to be intentionally discriminating if it knows of severe and pervasive sexual harassment occurring within its control and, for example, does nothing. *Gebser*, 524 U.S. at 290, 118 S.Ct. 1989.

It is with these two avenues in mind that the Court now turns to consider Plaintiffs' claims. First, Plaintiffs here allege what might be considered a "traditional" claim for sexual assault under Title IX. They argue that they were each sexually assaulted by a peer at Baylor, that they reported their assault to the university, and that Baylor's deliberately indifferent response to each of their reports deprived them of educational opportunities and benefits provided by the school. The Court will refer to these as Plaintiffs' "post-reporting claims."

Second, Plaintiffs allege that even prior to their initial reports of sexual assault, Baylor's discriminatory practices in handling reports of sexual assault—discouraging victims from reporting their assaults and failing to investigate their claims or punish their assailants—constituted a policy of intentional discrimination that substantially increased Plaintiffs' risk of being sexually assaulted. The Court will refer to these as Plaintiffs' "heightened-risk claims."

The Court will first address whether Plaintiffs have plausibly alleged each of these claims and then consider whether any plausibly alleged claim is barred by the applicable statute of limitations.

## A. Post–Reporting Sexual Harassment or Assault

■■■■ Each Plaintiff alleges that Baylor was deliberately indifferent to her reports of sexual assault, thereby causing

---

4. Employment claims against a school, such as a claim for retaliation made by an individual who complains about sex discrimination, also fall into this category. *See, e.g., Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005).

her further sexual assault or harassment or creating a hostile educational environment. As the Court previously explained, under Title IX, a school "may be liable for failing to address student-on-student sexual harassment 'only where [the school is] deliberately indifferent to .... harassment, of which [it has] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 995 (5th Cir. 2014) (quoting *Davis*, 526 U.S. at 650, 119 S.Ct. 1661). For the school to be said to have "actual knowledge" of harassment, an "appropriate person"—"an official of the recipient entity with authority to take corrective action"—must have both actual knowledge of the harassment and an "opportunity to rectify any violation." *Gebser*, 524 U.S. at 290, 118 S.Ct. 1989. Further, liability is limited "to circumstances where[ ] the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645, 119 S.Ct. 1661. Finally, the "harassment must have a 'concrete, negative effect' on the victims' education, such as creating [a] 'disparately hostile educational environment relative to [the victim's] peer,' forcing the student to change his or her study habits or to move to another [school], or lowering the student's grades.'" *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015) (citations omitted) (applying *Davis* in a Title VI case involving race-based student-on-student harassment).

Baylor makes three primary arguments that Plaintiffs' allegations are insufficient to state a claim for liability. First, it argues that Plaintiffs have failed to allege that an "appropriate person" at Baylor obtained "actual knowledge" of their harassment. (Mot. Dismiss Doe 8, Dkt. 63, at 10–12). Each Plaintiff alleges, however, that she reported her sexual assault to a Baylor office established by the university specifically to provide services and support to students, such as the Baylor Police Department or the Baylor Counseling Center.[5] Determining whether, from these reports, an official with the ability to take corrective action learned of the assaults is necessarily a fact-intensive inquiry. *See Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248, 1256 (11th Cir. 2010) ("[T]he ultimate question of who is an appropriate person is 'necessarily a fact-based inquiry' because 'officials' roles vary among school[s].'"). At this stage, the Court finds it plausible that personnel at these offices either were "appropriate persons" pursuant to Title IX or that such personnel communicated Plaintiffs' reports to an "appropriate person."

▮▮▮▮ Second, Baylor argues that non-compliance with regulatory and administrative guidance from the Department of Education ("DOE")—which Plaintiffs reference in their Complaint—cannot serve as the basis for establishing deliberate indifference. While the Court agrees that a school's failure to comply with certain DOE guidelines generally cannot, alone, demonstrate a school's deliberate indifference, *see Gebser*, 524 U.S. at 291–92, 118 S.Ct. 1989, it also agrees with numerous courts that DOE regulations may still be consulted when assessing the appropriateness of a school's response to reports of sexual assault. *See, e.g., Butters*

---

5. Baylor argues, in part, that physicians have a duty under Section 611.002 of the Texas Health and Safety Code to not share patient information and that, as such, any of the Baylor physicians who were informed of a sexual assault could not have acted on the information or shared it. Because no Plaintiffs allege they *only* reported their sexual assaults to a Baylor physician, (*see* Third Am. Compl. ¶¶ 59, 77–82, 114, 118, 159, 196), the Court finds this argument does not warrant the dismissal of any of Plaintiffs' claims.

*v. James Madison Univ.*, 208 F.Supp.3d 745, 757 (W.D. Va. 2016) ("[A] school's compliance ... with the [Dear Colleague Letter] can be a factor that the court considers"); *Doe v. Forest Hills Sch. Dist.*, No. 1:13-CV-428, 2015 WL 9906260, at *10 (W.D. Mich. Mar. 31, 2015) ("Although failure to comply with Title IX guidance does not, *on its own*, constitute deliberate indifference, it is one consideration").

▮▮▮▮▮ Third, Baylor argues that Plaintiffs failed to plausibly allege they were subjected to "further" harassment after reporting their initial sexual assault(s), especially for those Plaintiffs who do not allege that specific instances of assault or harassment took place after they reported their initial assault(s). While allegations of further assault or harassment are necessary for a claim under Title IX, the Supreme Court has made clear that to "subject" a student to harassment a school need only make the student vulnerable to that harassment. *Davis*, 526 U.S. at 645, 119 S.Ct. 1661. Thus, the discriminatory harm can include the harm faced by student-victims who are rendered vulnerable to future harassment and either leave school or remain at school and endure an educational environment that constantly exposes them to a potential encounter with their harasser or assailant. *See, e.g., Karasek v. Regents of the Univ. of Cal.*, No. 15-CV-03717, 2015 WL 8527338, at *12 (N.D. Cal. Dec. 11, 2015) (holding that a plaintiff may state a Title IX claim "even in the absence of any further affirmative acts of harassment" and noting that requiring otherwise "runs counter to the goals of Title IX"); *Takla v. Regents of the Univ. of Cal.*, No. 2:15-CV-04418, 2015 WL 6755190, at *5 (C.D. Cal. Nov. 2, 2015) ("[P]lacing undue emphasis on whether further harassment actually occurred to gauge the

responsiveness of an educational institution would penalize a sexual harassment victim who takes steps to avoid the offending environment."); *Kelly v. Yale Univ.*, No. CIV.A. 3:01-CV-1591, 2003 WL 1563424, at *3-4 (D. Conn. Mar. 26, 2003).

For example, in *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282 (11th Cir. 2007), the Eleventh Circuit held that the plaintiff-victim's immediate withdrawal from the University of Georgia—after being gang-raped in one of the student-rapists' dorm rooms—did not "foreclose her argument that [the university] continued to subject her to discrimination." *Id.* at 1297. This discrimination took the form of the university's failure to "take any precautions that would prevent future attacks from [the plaintiff's rapists] or like-minded hooligans should [the plaintiff] have decided to return," which "effectively den[ied] [her] the opportunity to continue to attend [the school]." *Id.*

▮▮▮ In light of its general rejection of Baylor's arguments, the Court finds that each Plaintiff in the instant case has plausibly alleged that Baylor was deliberately indifferent to her report(s) of sexual assault, depriving her of educational opportunities to which she was entitled. First, each Plaintiff plausibly alleges that while she was at Baylor, she was sexually assaulted by another student.[6] (Third Am. Compl., Dkt. 56. ¶¶ 54–55; 75, 85, 105, 107–08, 124–25, 152–53, 178, 192–93, 211–212, 235–36, 254). Second, each Plaintiff alleges she reported her assault or assaults to the Baylor counseling center, the Baylor police department, university medical personnel, or another student services office. (*Id.* ¶¶ 59, 78–79, 83, 118, 128–130, 132, 159, 184, 196, 214–215, 256). Third, each Plaintiff alleges that Baylor did nothing (or almost nothing) in response to the

---

**6.** Does 2, 3, and 10 do not expressly allege that their assailants were students, but the Court infers as much based on the Plaintiffs' related allegations. (Third Am. Compl., Dkt. 56, ¶¶ 85–86, 105, 107–08, 253–54).

reports of sexual assault. (*Id.* ¶¶ 59, 80–84, 120, 132, 134, 137, 143–144, 166, 184–185, 198–199, 221, 230, 237–38, 247, 258). Each Plaintiff also alleges that Baylor discouraged her from reporting her assault(s), failed to adequately investigate each the assaults, and failed to ensure she would not be subjected to continuing assault and harassment. (*Id.* ¶¶ 59, 80–84, 118–120, 134, 137, 144, 160–162, 184, 198–199, 226, 228–229, 238, 247, 259–260). Finally, each Plaintiff alleges concrete harms based on Baylor's inadequate response, such as a decline in grades, the loss of financial aid, severe stress, or depression. (*Id.* ¶¶ 61–71, 90, 103, 120, 135–45, 175, 187, 206–209, 231–232, 249–250, 261.)

## B. Heightened Risk of Sexual Harassment or Assault

 Plaintiffs also claim that Baylor's handling of reports of sexual assaults created a heightened risk of sexual assault throughout the university's student body. Specifically, Plaintiffs allege Baylor knew of and permitted a "campus condition rife with sexual assault," (Third Am. Compl., Dkt. 56, ¶ 29); that sexual assault was "rampant" on Baylor's campus, (*id.* ¶ 27); that Baylor mishandled and discouraged reports of sexual assault, (*id.* at 1, ¶ 36); and that Baylor's response to these circumstances "substantially increased" the risk that Plaintiffs and others would be sexually assaulted, (*id.* at 1). The Supreme Court has repeatedly explained that where the Title IX violation in question is caused by an institution's discriminatory policy or custom, courts need not apply the actual notice and deliberate indifference framework typically used in cases involving institutional liability for sexual harassment or assault. *See Gebser*, 524 U.S. at 290, 118 S.Ct. 1989 (stating that the actual notice and deliberate indifference requirements are restricted to those cases "that do not involve [an] official policy of the [funding recipient]"); *Davis*, 526 U.S. at 642, 119 S.Ct. 1661 (acknowledging that an institution cannot be liable unless it has notice that its conduct could subject it to a damages claim but providing that "this limitation . . . is not a bar to liability where a funding recipient intentionally violates the statute"). Plaintiff's heightened-risk claims fit squarely within the official-policy rubric previously identified by the Court, and the Court is satisfied that Plaintiffs have met their burden under Rule 12(b)(6).

 In evaluating such claims, courts must consider whether the defendant-institution's policy or custom inflicted the injury of which the plaintiffs complain. *See Gebser*, 524 at 291, 118 S.Ct. 1989 (locating an analogue to the Title IX jurisprudence in the municipal liability doctrine); *see also Bd. Cty. Comm'rs Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (explaining that plaintiffs seeking to impose liability on a municipality under § 1983 must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury"); *Collins v. City of Harker Heights*, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (noting the necessity of analyzing whether execution of a municipal policy inflicted the injury). The Tenth Circuit overturned a lower court's grant of summary judgment on this basis, permitting plaintiffs to attempt to show at trial that the University of Colorado at Boulder was liable because their sexual assaults "arose out of an official school program" and were a natural consequence of that program. *Simpson v. Univ. Colo. Boulder*, 500 F.3d 1170, 1174–75 (10th Cir. 2007).

 The Court is sensitive to concerns that application of this rubric to claims involving a school-wide risk of sexual assault may be taken to imply that higher education institutions, due to the prevalence of sexual assault among college-aged individuals, would face near-constant liability. It is an unfortunate truth that one

could "anticipate that the very operation of a school would be accompanied by sexual harassment." *Simpson*, 500 F.3d at 1177. But the official-policy rubric's extension of liability is limited by its demand that plaintiffs · demonstrate the misconduct complained of was "not simply misconduct that happened to occur [at the · school] among its students," *id.* ·at 1174, but·was in fact caused by an official policy or custom of the university. Liability cannot· be· based, for example, solely on a funding-recipient's "failure to promulgate and. publicize an effective policy and . grievance procedure for sexual harassment claims." *Gebser*, 524 at 291, 118 S.Ct. 1989.

▉ In the instant case, Plaintiffs allege Baylor and its staff repeatedly misinformed victims of sexual assault as to their rights under Title IX, (Third Am. Compl., Dkt. 56, ¶¶ 58, 119, 130–32, 185, 198–99, 216, 228, 238, 247); failed to investigate reported sexual assaults, (*id.* ¶¶ 57–58, 113–14, 130–32, 184, 228); and discouraged those who reported sexual assaults from naming their assailants or otherwise coming forward, (*id.* ¶¶ 80, 160–61, 226). Additionally, despite being informed of multiple sexual assaults between 2008 and 2011, the university reported to the U.S. Depart-

ment of Education that no such assaults took place on its campus during that period. (*Id.* ¶¶ 40, 176–78, 192). ·

These alleged facts, if construed as true, could allow a jury to infer that Baylor's policy or custom of inadequately handling and even discouraging reports of peer sexual assault created a heightened risk of sexual assault, thereby inflicting the injury of which Plaintiffs complain.[7]

## IV. STATUTE OF LIMITATIONS

▉ Having determined that Plaintiffs have adequately pled claims under Title IX, the Court will now consider whether any of Plaintiffs' claims are foreclosed by the applicable statute of limitations. "A motion to dismiss may be granted on a statute of limitations defense where it is evident from the pleadings that the action is time-barred, and the pleadings fail to raise some basis for tolling." *Taylor v. Bailey Tool Mfg. Co.*, 744 F.3d 944, 946 (5th Cir. 2014). While Title IX has no express limitations period, the Fifth Circuit recently held that the two-year general personal injury limitations period set out in Section 16.003 of the Texas Civil Practice and Remedies Code applies to Title IX claims brought in Texas.[8] *King–*

7. Because the Court finds that Plaintiffs have met their burden under the official-policy rubric, it does not evaluate this category of claims under the actual notice and deliberate indifference framework articulated in *Gebser* and *Davis*. However, Plaintiffs allege that Baylor knew of and permitted a "campus condition rife with sexual assault" and that its deliberate indifference to that condition increased Plaintiffs' chances of being sexually assaulted. (Third Am. Compl., Dkt. 57–1, at 1, ¶¶ 23, 264–66). As such, the Court declines to find that Plaintiffs' heightened-risk claims would not be actionable under the approach detailed in *Gebser* and *Davis*.

8. Plaintiffs argue that *King–White* involved a different set of facts and that this Court should not apply the two year statute of limitations to Plaintiffs' Title IX claims. They

point to other sections of the Texas Civil Practice and Remedies Code that provide for a significantly longer limitations period for specific types of claims, *see, e.g.,* Tex. Civ. Prac. & Rem. Code Ann. § 16.0045(a) (setting a limitations period of fifteen years for personal injury claims arising from sexual assaults), and a trend toward· extending statutes of limitations for claims and offenses related to sexual assault. But the Fifth Circuit decided *King–White* less than two years ago, and it explicitly considered and rejected reliance on Texas statutes that provide longer statutes of limitations depending on specific facts. *See* 803 F.3d at 761 ("[Supreme Court precedent] instructs us to apply the 'general or residual' personal injury statute of limitations ... [in Texas this] means applying the two-year period in Section 16.003, regardless of whether the facts underlying the particular ·claim

*White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 759–61 (2015); Tex. Civ. Prac. & Rem. Code Ann. § 16.003.

■■■■ "Absent tolling, the limitations period runs from the moment a plaintiff's claim 'accrues,' " and while the limitations period is borrowed from state law, "the particular accrual date of a federal cause of action is a matter of federal law." *King–White*, 803 F.3d at 762 (quoting *Frame v. City of Arlington*, 657 F.3d 215, 238 (5th Cir. 2011)). "[U]nder federal law, a claim accrues and the limitations period begins to run the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured." *Id.* (quoting *Spotts v. United States*, 613 F.3d 559, 574 (5th Cir. 2010)). "[A] plaintiff's awareness encompasses two elements: (1) [t]he existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions." *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001)). " '[A]wareness' [of the existence of the injury and causation] ... does *not* mean actual knowledge; rather, all that must be shown is the existence of 'circumstances [that] would lead a reasonable person to investigate further.' " *Id.* (quoting *Piotrowski*, 237 F.3d at 576). Thus, for awareness of causation, a plaintiff "must have knowledge of facts that would lead a reasonable person (a) to conclude that there was a causal connection ... or (b) to seek professional advice, and then, with that advice, to conclude that there was a causal connection between the [defendant's acts] and injury." *Harrison v. United States*, 708 F.2d 1023, 1027 (5th Cir. 1983).

■■■ With respect to Plaintiffs' heightened-risk claims, *see infra* Section III(B), Plaintiffs were aware of their injuries from the time the assaults occurred. Plaintiffs assert, however, that they had no reason to know of Baylor's alleged causal connection to their assaults until the spring of 2016, when media reports regarding the rampant nature of sexual assault on Baylor's campus first came to light. (*See* Third Am. Compl., Dkt. 56,¶¶ 27, 98). At that point, Plaintiffs allege, they had reason to further look into whether Baylor had a policy of intentionally discriminating against women who reported sexual assault. While it is plausible that Plaintiffs were aware of their heightened-risk claims at the time of their assaults, it is also plausible that they did not have reason to further investigate those claims until 2016. Thus, accepting the allegations in the Complaint as true, the claims for heightened-risk liability did not accrue until spring 2016, and the two-year statute of limitations had not run by June 15, 2016, when this case was first filed.

■■■ With respect to Plaintiff's claims post-reporting claims, the Court reaches a more varied conclusion. All Plaintiffs allege they reported their sexual assault to Baylor personnel and that Baylor failed to adequately assist them, sometimes discouraging them from seeking further assistance. Because of this deliberately indifferent response, Plaintiffs allege, they were subjected to further harassment or assault or were otherwise deprived of educational opportunities to which they were entitled. Within some reasonable amount of time after their initial reports, Plaintiffs would have understood that Baylor's deliberate

make an exception potentially applicable."). While the Court is sympathetic to Plaintiffs' argument that the same policy rationales that led the legislature to implement a longer statute of limitations in cases involving sexual

assault should apply in Title IX cases, the Court sees no room to diverge from the Fifth Circuit's binding precedent in *King–White* and understands the need for uniformity and predictability that guided that decision.

indifference to their reports was the cause of those post-reporting injuries or could reasonably have been expected to "inquire further." *See King–White*, 803 F.3d at 761–63; *see also Samuelson v. Or. State Univ.*, 162 F.Supp.3d 1123, 1127, 1134 (D. Or. 2016) (finding that a plaintiff was time-barred from bringing a claim because she "learned of [the funding recipient's] deliberate indifference to her report of rape when [the funding recipient] was in fact deliberately indifferent to her own report of the assault").

Based on this understanding, the claims of Does 3, 8, 9, and 10 each fall well within the two-year statute of limitations window because each of the initial assaults or reports occurred within two years of the filing of their claim.[9] Doe 3 was assaulted starting in the fall of 2013 and continuing through December 2015; her pleadings suggest that she reported the assaults to Baylor in the fall of 2014 or later. (Third Am. Compl., Dkt. 56, ¶¶ 107, 113–114, 118). Doe 8 was first assaulted in March 2015, (*id.* ¶ 211); Doe 9 in November 2014, (*id.* ¶ 235); and Doe 10 in February 2016, (*id.* ¶ 254); and each reported their assault sometime later.

The post-reporting claims of Does 1 and 4 do not fall as plainly within the statute of limitations, but it is conceivable that they did accrue within the statute of limitations. Doe 1 alleges that her sexual assault occurred on April 26, 2014. (*Id.* ¶ 54). She alleges that she "reported the sexual as-

sault to the Baylor advocacy center during the period of final exams." (*Id.* ¶ 59). Presumably, this was sometime in early to mid–May 2014. However, Plaintiff's claim did not accrue until she was aware or had reason to know of Baylor's deliberately indifferent response to these reports. It is unclear from the face of the Complaint when this would have occurred—while it may have occurred in May 2014, depending on the content and timing of her communications with Baylor, it is also quite possible that her claim did not accrue until the fall semester. Similarly, Doe 4 alleges that she was sexually assaulted on April 7, 2014. (*Id.* ¶ 124). She alleges she "first reached out to Baylor University staff through the Counseling Center" in June 2014. (*Id.* ¶ 128). Again, depending on the content and exact timing of her communications with Baylor, it is possible that Doe 4's claims did not accrue until after June 28, 2014, and thereby fall within the statute of limitations. Because it is not "evident" from the Complaint that the post-reporting claims of Does 1, 3, 4, 8, 9, and 10 are foreclosed by the statute of limitations, the Court denies Defendant's motion to dismiss with respect to these plaintiffs. *See Bailey Tool Mfg. Co.*, 744 F.3d at 946.

▮▮▮ Conversely, the post-reporting claims of Does 2, 5, 6, and 7 accrued well outside the statute of limitations. Doe 2 was first assaulted in September 2004; she reported the assault to Baylor personnel a few days later. (*Id.* ¶¶ 75–79).[10] Doe

---

**9.** This case was first filed by Does 1, 2 and 3 on June 15, 2016. (*See* Compl., Dkt. 1). The amended complaint adding Does 4, 5, and 6 was filed on June 28, 2016. (*See* Am. Compl., Dkt. 2). The third amended complaint, adding Does 7, 8, 9, and 10, was filed on October 28, 2016. (*See* Third Am. Compl., Dkt. 56).

**10.** Doe 2 also makes allegations related to her re-enrollment at Baylor in 2015. Specifically, she alleges the vice-provost would not allow grade forgiveness of some kind upon her re-enrollment, that she experienced severe trau-

ma in one campus building related to her prior assault, that she was "harassed and stalked by a neighbor off campus and reports to the University were met with misdirection," and that she suffered fear and anxiety after the media controversy arose related to sexual assaults at Baylor. (Third Am. Compl., Dkt. 56, ¶¶ 94–98). None of these allegations are sufficient to state an independent claim under Title IX, (*see* Def.'s Mot. Dismiss Doe 2, Dkt. 18, at 25–27), nor do they alter the timing of Doe 2's initial post-reporting claim.

5 was first assaulted in November 2005; she later reported the incident to Baylor personnel, then to the Waco police in February 2006. (*Id.* ¶¶ 152, 159–162).[11] The Complaint suggests that Doe 6 was first assaulted in 2007 or 2008 and that she reported her assault to Baylor soon afterward. (*See id.* ¶¶ 176–185).[12] Doe 7 was assaulted in May 2009, reported soon afterward, and knew of Baylor's deliberately indifferent response during final exams that spring. (*See id.* ¶¶ 192–200). Thus, the post-reporting claims of Does 2, 5, 6, and 7 each accrued by May 2009—more than seven years before their claims were filed.

 Plaintiffs argue that, nevertheless, the Court should toll the statute of limitations or apply the continuing violation doctrine to these claims. The Court finds that neither tolling nor the continuing violation doctrine is applicable. First, tolling is unavailable to Plaintiffs under Texas law. Plaintiffs cannot take advantage of Texas' discovery rule because they have provided no explanation as to why their injuries were "inherently undiscoverable," *see King–White*, 803 F.3d at 764. Nor can they take advantage of the equitable tolling doctrines they invoke—fraudulent concealment and equitable estoppel—because, again, Plaintiffs have not alleged any facts

from which the court can reasonably infer that they could not have "discovered" their post-reporting causes of action in the exercise of due diligence. *See Owen v. King*, 130 Tex. 614, 111 S.W.2d 695, 697 (1938).

 Second, the continuing violation doctrine cannot extend the post-reporting claims of Does 2, 5, 6, or 7 all the way to 2014 because each of these Plaintiffs left campus well before that date. *See, e.g., Messer v. Meno*, 130 F.3d 130, 134–35 ("The continuing violation theory relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period."). Thus, even if the Court were to decide that the continuing violation doctrine applied [13] and extended it to its furthest imaginable reach, such that Plaintiffs' claims for post-reporting liability extended to when they each left Baylor,[14] the post-reporting claims of Does 2, 5, 6, and 7 would still fall outside the statute of limitations. Thus, these post-reporting claims are dismissed.

## V. STATE LAW CLAIMS

In addition to their claims under Title IX, Plaintiffs also allege claims under Tex-

---

11. Doe 5 is entitled to tolling until she reached the age of 18. The Complaint states that she was 16 at her high school graduation. That event presumably took place in May 2005, because Doe 5 enrolled at Baylor in the fall of 2005. (*See* Third. Am. Compl., Dkt. 56, ¶¶ 146–147). Thus, at the latest, her claim was tolled until May of 2007. *See King–White*, 803 F.3d at 762 ("[W]hile the claims were tolled under Texas law until [plaintiff] turned 18, the clock immediately began to run when she reached the age of majority.").

12. Doe 6 also alleges that she "sent a letter to the University President regarding the mistreatment of her sexual assault report" in June 2013, "but no response was ever received." (Thid. Am. Compl., Dkt. 56, ¶ 188). This allegation is insufficient to state an inde-

pendent claim under Title IX and does not alter the accrual date of her initial post-reporting claim.

13. The continuing violation doctrine "typically arises in the context of [Title VII] employment discrimination," *Frame v. City of Arlington*, 575 F.3d 432, 438 (5th Cir. 2009), and the Fifth Circuit has cautioned courts to be wary of using it in other contexts. *McGregor v. La. State Univ. Bd. of Sup'rs*, 3 F.3d 850, 866 n.27 (5th Cir. 1993).

14. To be clear, the Court does not reach a decision on whether the continuing violation doctrine applies in Title IX case and, more importantly, does not intend to imply that this would be the doctrine's reach were it to apply.

as law for negligence and breach of contract.

## A. Negligence Claims

Plaintiffs allege that "[Baylor] owed Plaintiffs a duty of reasonable care" and that it "breached these duties in multiple ways." (Third Am. Compl., Dkt. 56, ¶¶ 271–72). Plaintiffs allege Baylor breached numerous duties, but focus on two in particular: (1) Baylor's duty to protect Plaintiffs from the criminal acts of others to the extent those acts were foreseeable; and (2) Baylor's duty to adequately hire, train, and supervise its employees regarding how to properly handle reports of sexual assault. The court addresses Plaintiffs' theories below.

### 1. Duty to Protect From Foreseeable Criminal Acts

The Court's jurisdiction over Plaintiffs' state law claims is supplemental to its federal question jurisdiction. 28 U.S.C. § 1367(a). A federal court exercising supplemental jurisdiction over state law claims must apply the substantive law of the state in which it sits. *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan,* 883 F.2d 345, 353 (5th Cir. 1989) (citing *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). As a result, this Court must apply Texas law to the state law claims discussed herein. In resolving issues of Texas state law, federal courts look to decisions of the Texas Supreme Court. *Hux v. S. Methodist Univ.,* 819 F.3d 776, 780 (5th Cir. 2016). If that court has not ruled on the issue, the federal court must make what is known as an "Erie guess"— that is, it must predict what the Texas Supreme Court would do if faced with the facts currently before the federal court. *Id.* Generally, state intermediate courts' decisions are the strongest indicator of what a state supreme court would do. *Id.* at 780–81.

In Texas negligence law, liability "is premised on duty, a breach of which proximately causes injuries, and damages resulting from that breach." *Thapar v. Zezulka,* 994 S.W.2d 635, 637 (Tex. 1999). Whether a legal duty exists is therefore a threshold question; if there is no duty, there can be no liability. *Id.* As a general matter, there is no duty to control the conduct of third persons. *See Greater Hous. Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex. 1990). However, that general rule does not apply when a special relationship exists between the actor and the third person that imposes a duty on the actor to control the third person's conduct. *Id.* Such special relationships traditionally include those between an employer and employee or between a parent and child. *Id.*

Here, Plaintiffs argue that Baylor had a special relationship with its students because "[o]ne who controls [a] premises ... [has] a duty to use ordinary care to protect invitees from criminal acts of third parties if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee." *Lefmark Mgmt. Co. v. Old,* 946 S.W.2d 52, 54 (Tex. 1997). "This duty ... is commensurate with the right of control over the property." *Id.* at 53–54; *see also Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 21 (Tex. 1993) ("In the landlord-tenant relationship, a duty to the tenant also attaches when the landlord has the right of control over the leased premises.").

The Texas Supreme Court, while noting that universities may be held liable for negligent failure to protect in some circumstances, has not specifically addressed the special relationship doctrine in the context of students and universities. *See generally Delaney v. Univ. of Houston,* 835 S.W.2d 56 (Tex. 1992) (reversing a trial court's grant of summary judgment to a

college and leaving open the possibility that the university could be liable for failing to replace defective locks on the doors of a dormitory, thereby enabling an intruder to enter and sexually assault a student). Intermediate Texas courts have declined to hold that the relationship between a private university and its adult students constitutes a special relationship, *see Boyd v. Tex. Christian Univ., Inc.,* 8 S.W.3d 758, 760 (Tex. App.–Fort Worth 1999, no writ), as have most courts surveying state law on this issue, *see, e.g., Freeman v. Busch,* 349 F.3d 582, 587–88 (8th Cir. 2003) ("[S]ince the late 1970s, the general rule is that no special relationship exists between a college and its own students because a college is not an insurer of the safety of its students").

■ While the Court appreciates Plaintiffs' arguments to the contrary, it is bound to follow state negligence law in evaluating Plaintiffs' claims under the duty-to-protect doctrine. While Does 1, 3, and 5 allege they were sexually assaulted on Baylor's campus, they have not alleged that Baylor failed to meet its duty to provide them with safe housing, thereby causing their assaults, nor have they provided any other exception to the general rule that a university has no duty to protect its students.

■ As to the other Plaintiffs, a Texas Court of Appeals has already specifically considered and rejected the proposition that universities have a duty to protect adult students from the criminal acts of other students while off-campus. *See Boyd v. Tex. Christian Univ., Inc.,* 8 S.W.3d 758, 760 (Tex. App.–Fort Worth 1999, no writ). Accordingly, Baylor's motion to dismiss any of Plaintiffs' claims predicated on the theory that Baylor breached its duty to protect Plaintiffs from the criminal acts of other students is granted.

### 2. Duty to Adequately Hire, Train, and Supervise Employees

■ Next, Plaintiffs argue that Baylor breached its duty, as an employer, to adequately hire, train, and supervise employees. While Plaintiffs are correct that such a duty exists in the general sense, *e.g., Castillo v. Gared, Inc.,* 1 S.W.3d 781, 786 (Tex. App.–Houston [1st Dist.] 1999, pet. denied) ("An employer has a duty to adequately hire, train, and supervise employees."), they fail to identify how Baylor breached this duty. For example, in order to establish a claim for negligent hiring, a plaintiff must demonstrate that there is "[some]thing in the employee's background that would cause a reasonable employer not to hire or retain the employee." *Dangerfield v. Ormsby,* 264 S.W.3d 904, 912 (Tex. App.–Fort Worth 2008). And "[t]o establish a claim for negligent training, a plaintiff must prove that a reasonably prudent employer would have provided training beyond that which was given and that failure to do so caused his injuries." *Id.* Plaintiffs have argued neither that Baylor failed to meet the standard of care for universities in hiring, training, and supervising employees nor that that such a standard extends to how employees handle reports of sexual assault. The court therefore grants Baylor's motion to dismiss Plaintiffs' claims for negligence to the extent they are premised on Baylor's breach of a duty to hire, train, or supervise its employees.

### 3. Other Duties

Lastly, Plaintiffs argue that Baylor breached a host of other alleged duties of reasonable care—for example, by failing to adopt sexual education programs to promote awareness of rape, acquaintance rape, and other sex crimes, and by failing to adopt and enforce procedures for students to follow should they be sexually

assaulted. Plaintiffs have not, however, identified any legal basis for the argument that these actions were required under any standard of reasonable care applicable to Baylor under state law. *Cf. Hux*, 819 F.3d at 783 (holding that no special relationship giving rise to a duty existed where a university "[e]ncourag[ed] students to take advantage of university mental-health resources, counsel[ed] students, and offer[ed] help to students struggling through disciplinary problems"). The court therefore grants Baylor's motion to dismiss Plaintiffs' remaining negligence claims.

### B. Breach of Contract

Plaintiffs also allege they had "valid enforceable contracts with [Baylor] as academic enrollees and also as residents living in on-campus housing," that Baylor breached these contracts by failing to adequately warn Plaintiffs of the risk of sexual assault on campus and by failing to provide an adequately safe living and educational environment, and that Plaintiffs suffered foreseeable damages as a result of these breaches. (Third. Am. Compl., Dkt. 56, ¶¶ 275–78). Baylor responds that Plaintiffs failed to plead the existence of an enforceable contract or to identify the provisions of the purported contract.

 The Court agrees that Plaintiffs do not adequately allege breach of contract. "A breach of contract ... only occurs when a party fails or refuses to perform an act that it expressly promised to do." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Georgia, Inc.*, 995 F.Supp.2d 587, 602 (N.D. Tex. 2014).

Thus, "[t]o plead a breach of contract claim, a plaintiff must identify a specific provision of the contract that was allegedly breached." *Id.* Here, Plaintiffs allege Baylor breached the purported contract [15] by (1) failing to adequately warn students of the high risk of sexual assault on campus; and (2) failing to provide Plaintiffs with an adequately safe living and educational environment. But Plaintiffs do not identify the terms or obligations of the purportedly breached contract, nor do they suggest what document or documents comprise that contract. Without these factual allegations, Plaintiffs' breach of contract claim does not provide Baylor with the fair notice of their claim required by Federal Rule of Civil Procedure 8. *See Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Baylor's motion to dismiss Plaintiffs' breach of contract claims is therefore granted.

### VI. CONCLUSION

For the foregoing reasons, the court hereby **ORDERS** that Baylor's motions to dismiss, (Dkts. 11, 13, 15, 16, 17, 18, 62, 63, 64, 65) are **GRANTED IN PART** and **DENIED IN PART**, consistent with the terms of this Order. Specifically:

- With respect to Plaintiffs' post-reporting claims, the Motions are **DENIED** as to Does 1, 3, 4, 8, 9, and 10 and **GRANTED** as to Does 2, 5, 6, and 7.

- With respect to Plaintiffs' heightened-risk claims, the Motions are **DENIED** as to all Plaintiffs.

---

15. Under Texas law, "a school's catalog constitutes a written contract between the educational institution and the student where the student entered the institution under the catalog's terms." *Alcorn v. Vaksman*, 877 S.W.2d 390, 403 (Tex. App.–Houston [1st Dist.] 1994, writ denied). Some Texas courts have also suggested that documents outside of the course catalog may constitute this written contract. *Southwell v. Univ. of Incarnate Word*, 974 S.W.2d 351, 356 (Tex. App.–San Antonio 1998, writ denied) ("[I]n the absence of a binding catalog, the student agrees that those terms are subject to change throughout the course of his or her education."). It remains unclear, however, whether a student may have a cause of action for breach of contract when a school fails to provide benefits other than those explicitly named in the catalog or other documents.

- With respect to Plaintiffs' state-law claims, the Motions are **GRANTED** as to all Plaintiffs.

The court further **ORDERS** that the stay of discovery in this case is **LIFTED**.